FJELDSTED v. OGDEN CITY et al.

No. 5381. Decided March 22, 1933. (28 P. [2d] 144.)

Dissenting Opinion December 14, 1933.
On Rehearing December 14, 1933.

*Thatcher & Young,* of Ogden, for plaintiffs.

*Stuart P. Dobbs,* of Ogden, for defendants.

*Joseph Chez,* Attorney General, *Fisher Harris,* of Salt Lake City, *Raymond B. Holbrook* and *George S. Ballif,* both of Provo, and *J. M. Foster,* of Cedar City, amici curiae.

FOLLAND, Justice.

This is an original proceeding in this court. On petition of plaintiff, a taxpaying resident citizen of Ogden, Utah, suing for himself and on behalf of others similarly situated, an alternative writ of prohibition was issued wherein the defendants were directed to desist further proceedings with reference to the issuance and sale of certain bonds in the sum of $645,000 until the further order of this court, and to show cause why the writ should not be made permanent. The defendant Ogden City is a municipal corporation of Utah, a city of the second class, and the individual defendants are the mayor, city commissioners, city treasurer, and city recorder, respectively, of such city. The defendants and each of them filed a general demurrer to the petition alleging that the petition does not set forth any cause of action or sufficient ground to warrant making the writ permanent. After the case was submitted, and after a tentative opinion was written, but not filed, the parties filed a stipulation adding to the petition certain allegations of fact which the parties considered might be material, and which

made clear certain allegations which before were indefinite, and stipulated that the demurrers on file be deemed as running to the petition as amended. The following statement of facts covers the allegations of the petition as amended:

The facts alleged in the petition and admitted by demurrer are these: Ogden City is a municipal corporation of the second class. It owns, maintains, and operates an existing waterworks supply and distribution system which supplies water to approximately 45,000 people. The waterworks system consists of certain wells heretofore drilled by the city in an artesian basin lying about eight miles easterly from the city at the head of Ogden Canyon, together with certain water supplies from side streams entering the canyon between the wells and certain reservoirs constructed and owned by the city and situate on high land in the eastern portion of the city. The water from the side streams is so controlled that, when needed, it is diverted into the reservoirs and commingled with the water from the wells. From the reservoirs the water is distributed throughout the city and to some extent outside the city limits by means of a system of water mains, laterals, and pipe connections. The system cost approximately $450,000 when first acquired in 1907, and on which there has been spent approximately $1,500,000 additional for enlargement and betterment.

The valuation of the taxable property within the city as shown by the assessment for 1932 is $37,992,012, 8 per centum of which would fix the debt capacity of the city at $3,039,360, under the provisions of the state Constitution. There are now outstanding general obligation bonds in the sum of $2,714,500, to which must be added $70,000 of sewer bonds authorized by the voters and about to be sold. A bond issue of $250,000 was heretofore authorized by vote of the qualified electors for a joint city and county building, to be issued and sold when Weber county raises a like amount for construction of such building, but these bonds have not yet been issued.

Of the outstanding bonds $1,522,500 are water bonds, the proceeds of which have been expended on the waterworks system. To pay the principal and interest on such bonds, the city has obligated itself to levy an annual tax sufficient for that purpose. The total revenues of the city for the year 1932, exclusive of any surplus from the waterworks department, will not exceed $488,572.92. The amounts budgeted for expenditure for the year exceed the amount of such estimated revenue by $40,972.37, substantially the whole of such expenditures having heretofore been made or obligations for the payment thereof having been incurred. The net operating revenue of the waterworks fund for the year 1932 will not exceed the amount of such deficit arising in the other funds, and the city has incurred obligations equal to its full current revenue for the year from all sources.

During the 6 years next prior to the filing of the petition, the waterworks system has produced a gross revenue in excess of $1,000,000, with an operating expense of slightly more than $300,000, yielding a net operating profit of approximately $745,000. During this 6-year period all the revenue derived by the city from the sale of water has been covered into the waterworks fund, created by the ordinance, section 162, hereafter quoted in full, and from such fund there has been paid, first, the current operating and maintenance expense of the system, a small part of the cost of betterments and improvements; the major part of the cost of improvements and betterments being paid out of revenues obtained by sale of bonds. Out of this special fund has been paid the interest charges on outstanding waterworks bonds, and such principal of waterworks bonds as has been paid during that period. (The amount of such principal payments is not disclosed.) After making such payments, and retaining some amount as a surplus in the waterworks fund, there has been a net surplus of from $55,000 to $90,000 each year which has been covered from the waterworks fund into the general fund of the city. None

of the water bonds heretofore issued and sold have by their terms been made a charge on the waterworks revenues, but expressly provide they are payable both as to principal and interest out of revenues raised by general taxation. During the 6-year period mentioned, the city has not levied any tax for the purpose of paying principal or interest on its waterworks bonds. In each of such years the maximum levy permitted by law of 2 mills on the dollar of assessed valuation for contingent expenses has been levied and the revenues received therefrom used for general fund purposes but not for payment of any service on waterworks bonds.

Some time prior to December 14, 1932, Ogden City made application to the Reconstruction Finance Corporation for a loan of $645,000 for which it would issue and deliver "Water Revenue Bonds" in the same amount, and in connection with such application prepared and presented a financial statement showing the revenues and expenditures of such city and of its waterworks department during the 6-year period referred to, together with estimates of the revenues and expenditures of the waterworks department for a period of 15 years commencing with the year 1933, based upon the actual receipts and expenditures over the period from 1927 to 1932, both inclusive. It is alleged:

"That during such past six year period the net obligations [revenues] in such Waterworks Fund remaining after payment of all charges thereunto, including interest and principal payments upon the Waterworks Bonds, was in excess of the annual charges for principal and interest under the proposed bond levy in any such period of six years. That such estimates disclose a probable net operating profit in the period of fifteen years, commencing with the year 1933 and ending with the year 1947, from the operations of such Waterworks System in excess of necessary current operating expense and cost of maintenance of $2,209,227.70; that the principal falling serially due upon the bonded indebtedness covered by outstanding Waterworks Bonds of Ogden City during such period would be $375,000.00; and the amount falling due under such proposed bond issue will be the whole thereof or $645,000.00, a total principal payment of $1,020,500.00, and the interest charges upon such outstanding obligations and proposed obligations during such period would be $887,875.50, leaving an estimated surplus of Waterworks revenue

over expenses of maintenance and current operation, retirement of principal and payment of interest on the outstanding Waterworks Bonds and bonds represented by Exhibit 'A' of $300,852.20."

The matter is probably immaterial to a determination of any issue in the case, but we have quoted the above statement in full, and suggest that it would appear from other facts set out in the petition that no account is taken in such estimate of the sinking fund requirements for a portion at least of the outstanding waterworks bonds. The statement includes an item of $375,000 to cover estimated serial payments on outstanding waterworks bonds. Under the statute such bonds may be payable serially over a period of not more than 40 years. $375,000 paid over a period of 15 years would amount to $25,000 per year, which would meet the serial requirements of only $1,000,000 of 40-year bonds, and leave $522,500 of bonds without any provision, in the estimate, for serial payments or sinking fund requirements. The estimate does not therefore include all the city's obligations on its bonds during the 15-year period mentioned.

Before December 14, 1932, there was passed by the board of commissioners of Ogden City and published an ordinance, in effect on and prior to that date, known as section 162, which is as follows:

"Waterworks Fund, Disposition. All moneys received from water rentals shall be paid into and accounted for separtely from other public moneys, and such moneys on hand at any time shall be termed the Waterworks Fund. All cost of maintenance and operation of such system of water supply and water works shall be paid therefrom. The Board of City Commissioners may also provide for the payment from such fund of any interest upon or principal payments falling due upon any bonded indebtedness of such city created in connection with the purchase of such water works system or its extension, improvement or other betterment, and whether represented by original issue bonds or refunding bonds, and may also provide for the setting up of a sinking fund or funds or surplus within such Waterworks Fund for the purpose of providing means of discharging any such bonds, and may provide the respective priorities of any such payments so ordered made therefrom. There shall next be paid therefrom the cost of any extension to or betterments to such water supply

system, which the Board of City Commissioners may have ordered paid therefrom. Any balance not expended for the above purposes may, at such time or times as such Board of Commissioners may determine, be transferred to the General Fund of such City."

With a view to borrowing the sum of $645,000, and without any authorization by a vote of the qualified electors of the city pursuant to the provisions of chapter 25, title 16, Comp. Laws Utah 1917 (section 792 et seq.), and without any intention of submitting the proposal to a vote of such qualified electors, the board of commissioners on December 14, 1932, passed and published an ordinance, now in force, if within the power of the board to enact, providing for the issue and sale of $645,000 "Water Revenue Bonds," the proceeds of which were to be used, as stated therein, "for the purpose of making repairs, improvements, and extensions to the waterworks system of Ogden City, and to provide for the public safety, preserve the public health, promote the prosperity and improve the morals, peace, order, comfort and convenience of the inhabitants of said City." Such repairs, improvements, and extensions to the waterworks system as shown by plans and specifications of the city engineer are the following:

"(a) Construction of a pipe line conduit from a point in Ogden Canyon substantially below such artesian wells and at a point where the surface water supply, farthest distant from said city is taken into such system to said city reservoirs, at an estimated cost of $410,620.00;

"(b) Construction of an additional reservoir with a capacity of approximately 38,000 gallons, immediately south of the present city reservoirs and intended solely to supplement the reservoir supply of such city as provided by said present reservoirs, at an estimated cost of $110,000.00;

"(c) Installation of various pipe line replacement, including both main pipe lines and laterals within said city, at an estimated cost of $75,000.00; and

"(d) Purchase of and installation of meters for the purpose of measuring the water supply furnished to water users within said city at an estimated cost of $50,000.00."

The ordinance contains the ordinary and necessary recitals authorizing the issue of such bonds, and, in addition

thereto, provides for payment of principal and interest out of a "Waterworks Fund" to be maintained during the life of the bonds, and created solely by revenues to be derived from sales of water from the entire waterworks system, and that "said bonds shall constitute a lien upon the net revenues from said waterworks system prior to any thereon which may be given to any other bonds or other obligations subsequently issued"; that payments from the "Waterworks Fund" shall be made solely for the following purposes:

"(a) First, all reasonable expenses of operation and maintenance of said waterworks system.

"(b) Second, the principal of and interest on said bonds as the same shall become due."

"That out of any moneys over and above the amounts required for the aforesaid payments a reserve shall be accumulated and maintained in an amount at least equal at any time to the amount of principal of and interest on said bonds falling due during the next ensuing fiscal year."

Any moneys in the fund over and above the amounts required for these payments and reserve are to be disposed of as the board of commissioners may determine.

The bonds are to bear 5 per cent interest payable on the 1st days of January and July of each year, and principal payments are to be made annually in specified sums from $15,000 to $50,000 over a period of twenty years. Other obligations stated in the ordinance are as follows: (a) That the city will charge and collect sufficient rates on water furnished from the system to provide for all payments and reserve specified in the ordinance; (b) the bonds are to be sold on the best terms obtainable, without regard to face value; (c) the city shall pay into the "Waterworks Fund" the reasonable value of all water used by it for public purposes; (d) for the purpose of servicing the bonds, the fiscal year shall continue to be the same as the calendar year until the bonds are paid or retired; (e) that the ordinance shall constitute a contract between the city and the holder or holders of such bonds who may enforce performance of any of the provisions by appropriate action in law or equity;

(f) the bonds to be issued with interest coupons attached; (g) the holder to have the option or privilege of registering the bonds as to principal, or principal and interest, with the city treasurer.

Plaintiff alleges that it is the purpose and intent of the board of commissioners to sell such bonds from time to time as the making of the improvements requires, at private sale without public advertisement, and that such board is about to call forthwith for bids on the bonds or some part thereof; that, subsequent to the passing of the bond ordinance, and prior to filing the petition in this court, plaintiff made demand on the defendants and each of them to desist from taking any steps under the terms of the bond ordinance toward the issuance or sale of such bonds, and the board of commissioners and each of the individual defendants denied such demand, and, unless restrained by an order of court the board of commissioners, will authorize and offer such bonds for sale and "sell the same contrary to the provisions of the laws of the State of Utah and in excess of the powers of said City and of said Board of City Commissioners, and the said other defendants will perform such acts with respect to such bond issue as such ordinance provides to be done respectively by them."

It is further alleged in the petition as follows:

"That it is not possible for said city to segregrate the revenues here from said proposed improvements and betterments to said system of waterworks supply from the revenues now derived from said system of waterworks and supply as presently constituted nor is it possible for said city to determine that any proportion of the total revenues from such waterworks and supply system derivable from the same after the making of said proposed improvements, can be ascribed to and will be derived from said proposed improvements; further that said proposed bond issue is wholly without warrant of law and in excess of the powers of such city and of any powers or authority of its said Board of City Commissioners and that the same will constitute an illegal and void issuance of public obligations and will result in great expense to such city and will occasion increased taxation by such city and consequent loss to this applicant and all others similarly situated."

The reasons stated in the petition for the invalidity of the bond ordinance and the proposed water revenue bonds to be issued pursuant to its terms are as follows: (a) The ordinance provides for sale of the bonds for the best terms obtainable, and does not restrict the sale to the face value thereof as required by section 794, Comp. Laws Utah 1917, as amended by chapter 63, Laws Utah 1925; (b) that no provision is made for levy of a tax to meet any deficiency if the rates and charges from the water system are insufficient to meet operating and maintenance charges and payments due on such bonds; (c) the agreement to pay into the waterworks fund the reasonable value of all water used by the city for public purposes imposes a burden on the general revenues of the city for the benefit of the fund; (d) that the city cannot covenant with respect to its fiscal year, as that power is vested in the Legislature by section 1, art. 13, of the Constitution of Utah; (e) that such an indebtedness cannot be incurred without the submission of the proposal to create such debt to a vote of the qualified electors as provided by section 792, Comp. Laws Utah 1917; (f) that such bond issue will increase the indebtedness of the city to an amount in excess of the limit of indebtedness fixed by section 4, art. 14, of the Constitution of Utah; (g) the ordinance creates a debt in excess of the taxes and potential revenues of the city from taxation and all other sources for the current year, and in excess of the estimated expendable revenue for the year; (h) such indebtedness is in excess of the budget provisions of the year 1932; and for which no provision has been made by the budget for that year; (i) there is no warrant in law for the city to pledge the net revenues of the water system for the payment of the principal and interest of such bonds; or (j) giving these bonds a lien on the net revenues of the water system superior to that of any other bonds, prior or subsequent, issued in connection with the purchase, construction, maintenance or betterment of the system; or (k) the creation of the special fund by section 161 of the Revised Ordinances, as amended;

or (l) the accumulation and maintenance in the special waterworks fund of an amount equal to the amount necessary to pay principal of and interest on any bonds falling due the next ensuing year, thereby depriving the city of the use of moneys so retained and imposing an additional burden on the taxpayers of the city; or (m) the issuance of coupon bonds, or the privilege of registration of such bonds, both as to principal and interest; or (n) to charge and collect sufficient rates for water furnished to provide all payments specified in such ordinance, since the city is without power to fix any rate except such as may be reasonable for the service rendered; or (o) covenanting that such ordinance shall constitute a contract between the city and the holders of such bonds, enforceable in law and equity, thereby abdicating and waiving all right to pass any ordinance amendatory thereto.

It is conceded by defendants that the proposed improvements will afford no new source of revenue, but defendants say that they will reduce waste of water and increase the safety and efficiency of the system. The betterments will be built into the present system in such manner that it will be impossible to measure in terms of money any saving affected thereby in any accurate or even approximate manner.

The decisive question presented by this record is whether or not the obligation to be incurred by issuance of proposed bonds is a "debt" of the city, as contemplated by the provisions of our Constitution. The Constitution provides:

Article 14, § 3: "No debt in excess of the taxes for the current year shall be created * * * by any city * * * unless the proposition to create such debt, shall have been submitted to a vote of such qualified electors as shall have paid a property tax therein, in the year preceding such election, and a majority of those voting thereon shall have voted in favor of incurring such debt."

Article 14, § 4: "* * * No city * * * shall become indebted to an amount, including existing indebtedness, exceeding four per centum of the value of the taxable property therein, the value to be ascertained by the last assessment for State and County purposes, previous

to the incurring of such indebtedness; except that in incorporated cities the assessment shall be taken from the last assessment for city purposes; provided, that no part of the indebtedness allowed in this section shall be incurred for other than strictly county, city, town or school district purposes; provided further, that any city of the first and second class when authorized as provided in Section three of this article, may be allowed to incur a larger indebtedness, not to exceed four per centum * * * for supplying such city or town with water, artificial lights or sewers, when the works for supplying such water, light and sewers, shall be owned and controlled by the municipality."

It is apparent from the admitted facts, and indeed is conceded by defendants, that the proposition of creating the indebtedness was not authorized by a majority of the qualified electors; that the $645,000, if added to the amount of outstanding bonded indebtedness, is in excess of 8 per cent of the assessed value of taxable property in the city; that the amount of the issue is in excess of the revenues of the city for the year 1932; and that no provision was made in the budget of 1932 for payment of part or all of the bond obligation.

The issue is concisely stated by defendants in their brief as follows: "If the proposed bond issue is subject to the constitutional provisions imposing limitations upon the power of cities of the second class as to issuance of bonds or incurrence of indebtedness, or to the provisions of the budget law, the ordinance is void, the city commissioners have exceeded their powers, and the writ requested should be made permanent."

Defendants contend the obligation is not a "debt" within contemplation of the constitutional provisions, since by the terms of the ordinance the principal of and interest on the proposed bonds are made payable solely out of a special fund called the "Waterworks Fund," to be created by the impoundment of the revenues earned by operation of the waterworks system, and from no other source, and that the bonds are not general obligations of the city. They cite the following cases and authorities in support of their contention: *Barnes* v. *Lehi City*, 74 Utah 321, 279 P. 878, 885;

*Shields* v. *City of Loveland,* 74 Colo. 27, 218 P. 913; *Faulkner* v. *City of Seattle,* 19 Wash. 320, 53 P. 365; *Donahue* v. *Morgan,* 24 Colo. 389, 50 P. 1038; *Shelton* v. *City of Los Angeles,* 206 Cal. 544, 275 P. 421; 6 McQuillin on Municipal Corporations (2d Ed.) 48, 49; 19 R. C. L. 985, 986; 44 C. J. 1131. Other cases support the same view: *Searle* v. *Town of Haxtun,* 84 Colo. 494, 271 P. 629; *Ward* v. *Chicago,* 342 Ill. 167, 173 N. E. 810; *Scott* v. *City of Tacoma,* 81 Wash. 178, 142 P. 467.

What has come to be known as the "Special Fund Rule," supported by a great majority of cases, and adopted in this state by the case of *Barnes* v. *Lehi City,* supra, is that constitutional or statutory limitations upon municipal indebtedness are not violated by an obligation, which, by contract of purchase, or issue of notes or bonds, is payable out of a special fund created by the net income or revenue to be derived solely from the property purchased, and the municipality is not otherwise obligated to pay the liability. See cases cited in *Barnes* v. *Lehi City,* supra, and in note, 72 A. L. R. 688.

We have no desire to repudiate or depart from the rule announced in *Barnes* v. *Lehi City,* supra, as it is supported by sound reason and by the overwhelming weight of authority. In order to approve the contentions of Ogden City in this case, we would be required to enlarge the rule of the Barnes Case and open the door to much borrowing by the municipalities of this state in violation of constitutional restrictions and limitations. It matters not how anxious public officials may be to bring about desirable and necessary improvements and betterments, such improvements, under our Constitution and law, must be paid for either out of revenues within the treasury or such as may be lawfully anticipated as revenues of the current year (*Dickinson* v. *Salt Lake City,* 57 Utah 530, 195 P. 1110), or the debt incurred for such improvements must be authorized by a majority vote of the qualified electors (Const. art. 14, § 3), and be within the constitutional limitation of 4 per cent or 8 per cent, as the

case may be, based on the value of taxable property of the city (Const. art. 14, § 4), or be paid for exclusively out of the net earnings or income of the property or improvements purchased (*Barnes* v. *Lehi City,* supra).

The facts in the Barnes Case show that Lehi City had an electric light distributing system used to furnish the city with street lights, but its generating plant was inadequate and dilapidated. No income was produced from the system. The city made a contract with Fairbanks, Morse & Co. for certain generating machinery, whereby the company retained title to the machinery until paid, and agreed to accept installment payments from the earnings of the plant. Any future administration of the city could, without violation of the contract, repudiate the transaction and refuse to continue payments, and the only recourse available to the company would be to retain payments already made and repossess the generating machinery to which it retained title. In the decision of *Barnes* v. *Lehi City,* supra, it was said:

"It has now become a well-recognized principle of law that these constitutional provisions do not apply to a case where public property is purchased or constructed, and payment therefor is to be made, exclusively from the revenues derived from the property. In the instant case, impounding the earnings of the electric light and power plant in a special fund which is expressly pledged for the purpose of maintaining the plant and the payment of the interest and purchase price installments as they accrue under the proposed contract casts no additional burden on the taxpayers of Lehi City. * * * The credit of the city is not extended, nor is any money which is derived from taxation or other existing sources of revenue expended, in the purchase price or maintenance cost of the plant. The city cannot be coerced into applying any part of its general revenue for the payment of the purchase price of the plant or for any part of the cost of maintenance thereof."

By the admitted facts in this case a large income from an existing waterworks system owned by the city is pledged to pay the principal and interest on the bonds; the greater part of the property to be purchased or improvements made

will be incorporated or built into the existing waterworks system in such manner that it could not be thereafter segregated or withdrawn without destruction of the new property and destructive impairment of the entire system; the city is irrevocably pledged to pay the bonds out of revenues of which the city is now the owner, and no future board of commissioners will have any option to repudiate the obligation or decline to carry out the terms of the contract. True, the fund out of which the bonds are to be paid is a special fund, but it is a special fund created by impounding the revenues earned by property of which the city is now the owner, and which, but for the contract, would be available for use by the city in meeting its other obligations.

The special fund rule is not without its limitations. These have been pointed out by the Supreme Court of California in the recent case of *Garrett* v. *Swanton*, 216 Cal. 220, 13 P. (2d) 725, 729, as follows:

"An examination of the cases from other jurisdictions establishes the fact that there are at least two well-settled limitations or exceptions to the 'special fund' doctrine. Thus it is well established that an indebtedness or liability is incurred when by the terms of the transaction a municipality is obligated directly or indirectly to feed the special fund from general or other revenues in addition to those arising solely from the specific improvement contemplated. It also seems to be well settled, as a second limitation to the doctrine, that a municipality incurs an indebtedness or liability when by the terms of the transaction the municipality may suffer a loss if the special fund is insufficient to pay the obligation incurred."

We are of the opinion that the admitted facts bring the transaction involved in the instant case within either or both of these exceptions or limitations. The waterworks system was acquired and constructed at a cost of over $2,000,000, and there are still outstanding general obligation water bonds of the city in the sum of $1,522,500. Heretofore, the net surplus revenue from the operation of the waterworks system, over and above cost of operation and maintenance, was applied to the payment of interest and serial payments of principal on such bonds, and a balance

of from $55,000 to $90,000 each year covered into the general fund to meet other general obligations of the city. Now it is proposed to impound the whole of such net surplus revenues in the special waterworks fund and pledge such to the payment of the "Water Revenue Bonds." In other words, it is not only income earned or to be earned by the contemplated improvements that constitutes the special fund, but income from the entire system. It is not alleged that the new improvements and betterments would materially increase the revenue of the system, or that the income from such, if any, can be segregated or estimated. In the brief of defendants, it is admitted that this cannot be done and that there will be no measurable increase in revenue. It follows necessarily, therefore, that the burden on the general taxpayer will be increased to make up to the general fund the amount which formerly went to the general fund, but now is to be impounded in the waterworks fund to meet the obligation of the water revenue bonds. Thus, while tax revenues are not directly pledged to the payment of the water revenue bonds, the tax levy must be increased, and such revenues will be indirectly used to feed the special fund. This situation is made plain by the fact that, when the net water revenues for the year 1932 are diverted to the special fund, the general revenues of the city will be $40,972.37 short of meeting the budget requirements of that year. This deficit must be made up by general taxation. The city will also lose property in the form of established income when such income is impounded in the special fund and pledged to meet the requirements of the water revenue bonds. We agree with what was said by the California Supreme Court on this point in the case of *Garret* v. *Swanton,* supra, as follows:

"We do not believe that the 'special fund' doctrine was ever intended to be applied to a situation where the municipality, directly or indirectly, is or may be compelled to feed the special fund from other revenues in addition to those arising from the special improvement contemplated. Such a subterfuge, if sanctioned, would go far to effectually wipe out the purpose and intent of the constitutional provision."

There are cases which hold that, where improvements to or extensions of an existing system increase the revenues of the system, and such increase can be segregated and measured, the making of a contract of purchase will be upheld where the increased revenues or savings alone are pledged to the payment of the purchase price. This is in harmony with, and not an extension of, the doctrine of the case of *Barnes* v. *Lehi City*, supra, where the purchase price was to be paid exclusively out of earnings of the purchased property. *Bell* v. *City of Fayette*, 325 Mo. 75, 28 S. W. (2d) 356; *Jones* v. *City of Corbin*, 227 Ky. 674, 13 S. W. (2d) 1013.

As already indicated, the contract approved by this court in *Barnes* v. *Lehi City* was such a contract as could be abandoned or repudiated at any future time by the governing authorities of the city, and the city would lose nothing of its owned property or income and would be under no obligation to make further payment. The contractor would, under the express terms of the contract, take back its own property and retain the paid installments, which would represent merely the earnings from the contractor's property No such results would follow here. There is no way left open for subsequent boards of commissioners to refuse to be bound by the debt obligation imposed by the bonds. The bondholders could not repossess the property purchased by the proceeds of the bonds. The improvements and betterments are to be so built into the existing system that they could not be segregated. On the other hand, the ordinance expressly provides that its terms and obligations may be enforced by appropriate action in law or in equity. The city is bound to pay the interest on and principal of the bonds, and may by court action be coerced to raise or maintain the water rates sufficiently to meet such obligations, and to continue to divert revenues now owned by it, resulting from the operation of its waterworks system, into the special fund to pay the water revenue bonds and interest. This is a liability voluntarily incurred by the city by express

contract, and which it is bound to pay in money, and therefore a "debt." *Overall* v. *City of Madisonville*, 125 Ky. 684, 102 S. W. 278, 12 L. R. A. (N. S.) 433; 17 C. J. 1376. While we indicated in the *Barnes* v. *Lehi City* Case that the word "debt," in construing constitutional restriction, has a meaning less broad and comprehensive than it bears in general usage, yet we think such word cannot be so, construed as to exclude an obligation, such as we have here, where the city cannot escape the obligation and may be compelled to make payment, even though payment be limited to a special fund, where the special fund is made up of revenues from property now owned by the city. But, if the ordinance did not so provide, yet the city for the strongest of reasons, after having received and spent the proceeds of the bonds, would be bound to discharge the debt. *Muir* v. *Murray City*, 55 Utah 368, 186 P. 433. This distinction is pointed out in *State* v. *City of Portage*, 174 Wis. 588, 184 N. W. 376, 377, as follows:

"The distinguishing element, as then defined, consisted in the fact that the city could not be coerced by the creditors of its grantor into applying to his claim either its general revenue or property owned by it at the time of the contract, but was free at its election to abandon the plan of acquiring or holding that which, prior to the contract, it did not own."

While there is lack of harmony in the decided cases, we are satisfied that the weight of authority and better reasons compel a holding that bonds such as Ogden City now proposes to issue and sell constitute a debt subject to the limitations and restrictions imposed by sections 3 and 4 of article 14 of our Constitution. Such water bonds cannot be issued or sold unless authorized by a majority vote of the qualified electors of the city, and, when added to existing indebtedness, be within 8 per cent of the value of the taxable property of the city. The following cases support this view: *Garrett* v. *Swanton*, supra; *Hesse* v. *City of Watertown*, 57 S. D. 325, 232 N. W. 53; *Hight* v. *City of Harrisonville*, 328 Mo. 549, 41 S. W. (2d) 155; *City of Campbell* v. *Arkansas-*

*Missouri Power Co.* (C. C. A.) 55 F. (2d) 560; *Zachary* v. *City of Wagoner*, 146 Okl. 268, 292 P. 345; *Miller* v. *City of Buhl*, 48 Idaho 668, 284 P. 843, 72 A. L. R. 682; *Fox* v. *Bicknell*, 193 Ind. 537, 141 N. E. 222.

It was argued that, since the city commission has a right to impound the net earnings from its water department over a series of years, and then expend such revenues for betterments or extensions, it may also anticipate such revenues and borrow now for improvements and betterments and repay the obligation out of earnings in the future. A sufficient answer is that in the first instance the money is on hand and may be expended for any lawful purpose, while in the second an indebtedness must be incurred. The law allows city boards to expend revenues on hand or anticipated revenues for the current year, but places restrictions on their borrowing powers where they attempt to pledge anticipated revenues of future years.

It is admitted that no provision was made in the 1932 budget with respect to the issue of the water revenue bonds. Whether any provision was made in the 1933 budget for payment of interest on such bonds is not disclosed by the pleadings.

We hold to the view that all revenues and expenditures of the waterworks department are subject to the requirements of the budget law. Chapter 15, Laws Utah 1925. This enactment provides that each city commissioner shall report to the city auditor on or before October 1 of each year "a detailed estimate of the revenues and of all the necessary expenditures of the department or departments under his supervision." Section 1. From the information contained in such reports the budget for the ensuing year is prepared. The budget as finally adopted is the basis for an appropriation ordinance which is required to be passed. It is made unlawful for any board of city commissioners to make any appropriation in excess of the estimated expendable revenue for the ensuing year, and city auditors are forbidden to draw warrants on city funds

except in accordance with and within the limits of an appropriation ordinance. One of the departments of the city government under the direct supervision of a city commissioner is the "department of water supply and water works." Comp. Laws Utah 1917, title 16, ch. 2, § 552. The commissioners of all departments are required by the budget law to report both revenues and expenditures for budget purposes. There are no exceptions specified in the law.

While undoubtedly the city commission may for convenience in bookkeeping and the more business like manage- of its affairs create a special waterworks fund, into which shall be paid and accounted separately all moneys received from water rentals, and out of which shall be paid all costs of operation, maintenance, betterments to the system, bond interest, and principal of water bonds, yet by so doing the revenues and expenditures of the waterworks department cannot be withdrawn from control by the provisions of the budget statute. The provisions of the statute cover the department of water supply and waterworks equally with other departments of the city government which may be supported in whole or in part from taxation. Not anything is stated in the statute to afford any basis for distinguishing revenues of a waterworks system already owned, from other revenues of the city, for the purpose of budget control.

In *Barnes* v. *Lehi City*, supra, it was said:

"Laws Utah 1925, c. 30 p. 49, provides for a budget system in cities of the third class. From the principles establised by the foregoing authorities, it must be held that such statute has no application to the payment of the purchase price installments from the special fund."

This language, of course, is applicable to the facts of that case, and cannot be extended to cover a different set of facts. There the special fund was created out of revenues produced by the property purchased and did not include revenues from an already existing system owned and operated by the city and producing revenues which thertofore were subject to the budget law.

This court has in a series of cases held that the phrase "taxes of the current year," in article 14, § 3, of the Constitution, means revenues of the current year, and includes all revenues of the city, including taxes, license fees, waterworks income, and department fees. *Fritsch* v. *Board of Com'rs of Salt Lake County*, 15 Utah 83, 47 P. 1026; *Muir* v. *Murray City*, supra; *Dickinson* v. *Salt Lake City*, supra; *Scott* v. *Salt Lake County*, 58 Utah 25, 196 P. 1022. In anticipation of this revenue, the city authorities may borrow or otherwise contract without a vote of the people and without regard to constitutional debt limit. This is all revenue which the board of commissioners may expect to receive in any one year. It would be inconsistent to say these revenues are included in the language "taxes of the current year" for purposes of tax anticipation borrowing (*Dickinson* v. *Salt Lake City*, supra), but give them another name or classification for the purpose of permitting borrowing against anticipated revenues of future years. If these revenues are "tax revenues" for one purpose in contemplation of constitutional restriction, why should they be regarded as other than tax revenues for some other purpose?

While what we have already said effectually disposes of this case, we have been urged by counsel to pass on other objections raised by the pleadings on account of the fact that other municipalities are interested in the outcome, and should be guided as to the manner in which moneys may be obtained for the purchase or construction of new water plants and the enlargement and improvement of existing water systems. For this reason we express our views on other points made in objecting to the proposed bond issue.

It is urged that a municipality has no express statutory or implied power to issue or authorize the issuance of self-liquidating bonds. The statute provides for the issuance of bonds by cities in sections 792 and 794, Comp. Laws Utah 1917, but these provisions are limited to bonds issued within the constitutional debt limit and where authorized by a majority of the qualified electors.

Section 570x6, Comp. Laws Utah 1917, authorizes cities to borrow money on the credit of the corporation for corporate purposes in the manner and to the extent allowed by the Constitution and laws. These provisions of the statute do not control the making of conditional sale contracts, or the issue of bonds for true self-liquidating obligations, such as may be within the doctrine of the case of *Barnes* v. *Lehi City,* supra. In that case the question of power in a city to incur the particular form of obligation therein approved was not discussed. By numerous sections in the statutes the municipalities of the state are granted ample power to purchase, lease, construct, maintain, manage, and operate part or all of a waterworks system. See sections 570x14, 570x15, 570x18, 570x75, 570x21, and 575, Comp. Laws Utah 1917. For the purpose of acquiring water and water rights and constructing waterworks it may levy a tax, Comp. Laws Utah 1917, § 671, or issue bonds, Comp. Laws Utah 1917, § 792, and Const. art. 14, § 4. There is no mention anywhere in the statutes or Constitution of conditional sale contracts or of self-liquidating bonds. The statute has conferred the power to purchase, lease, and construct waterworks or water supply systems, but has not, other than already indicated herein, specified the manner in which, or means by which, the municipality may accomplish its purposes within the powers conferred. It is competent for a municipality to accomplish such purposes in any lawful manner, and may itself by ordinance provide the manner and details necessary for the full exercise of such powers under the provisions of Comp. Laws Utah 1917, § 578, which is as follows:

"When by this title power is conferred upon the city council to do and perform any act or thing, and the manner of exercising the same is not specifically pointed out, the city council may provide by ordinance the. manner and details necessary for the full exercise of such power."

Specific objections made to the various conditions stated in the ordinance, and our comments, follow:

(a) The ordinance provides that the bonds may be sold

on best terms obtainable, where as Comp. Laws Utah 1917, § 794, as amended by Laws Utah 1925, c. 63, provides that "no such bonds shall be sold for less than their face value." This section applies to the sale of all bonds issued pursuant to statutory and constitutional authority, and does not apply to such bonds or other obligations as are not a debt of the municipality.

(b) The ordinance makes no provision for the levy of taxes to pay interest or principal when due or to meet any deficiency, as required by section 794, supra. This provision does not apply where the obligation is not a debt of the city as herein defined, but does apply when the obligation to be incurred is such a debt.

(c) The bond ordinance requires that "the reasonable value of all water used by Ogden City for public purposes shall be paid by said City into the Waterworks Fund." We can see no objection to a municipality, which owns and operates a waterworks system or other utility, adopting as a policy the requirement that the city or its several departments should pay for such of the product or service as is used by the city in its public service, such reasonable rates, uniform in proportion to amount used, as is charged other users or consumers. Indeed, when a public utility is operated by a municipality, its books of account should be so kept that they disclose whether or not the property is self-supporting. The income should be sufficient to pay interest on and principal of the bonds issued or other obligations incurred in the purchase, improvement, or extension of the system, in addition to cost of operation, maintenance, betterments, and replacements. The amendment to Laws Utah 1925, § 794, p. 116, c. 63, contemplates that the system should bear the burden of paying interest on and principal of bonds, the proceeds of which have gone into the system, and that the general taxpayer should only be burdened with the deficiency. Good business principles dictate that such utility be self-supporting so far as possible. That this provision alone does not create a debt within con-

templation of the Constitution was held in *Barnes* v. *Lehi City*, supra, where the court said:

"The general rule is that such contracts, being for services to be paid for periodically, are merely arrangements to pay for current expenses as they are incurred."

The city has not obligated itself to purchase its water from the water department, nor bound itself to take any particular amount of water, but merely to pay for what it uses each year during the life of the bonds. 6 McQuillin on Municipal Corporations, p. 52; 44 C. J. 1130.

(d) The ordinance provides that "for the purpose of servicing the bonds herein authorized, that its fiscal year shall continue to be the same as the calendar year until all of said bonds are paid and retired." Whether section 1 or article 13 of the Constitution, providing that "the ▮ fiscal year shall begin on the first day of January, unless changed by the Legislature," inhibits a municipality from fixing its fiscal year, we need not decide. The city has not attempted to fix a fiscal year other or different from that specified in the Constitution.

(e) We see no reason why a municipality may not issue coupon bonds, or provide for registration of its ▮ bonds, or the bonds and coupons.

(f) The ordinance provides "that so long as any of said bonds are outstanding and unpaid, it (the city) will charge and collect sufficient rates for water furnished from said system to provide for all payments and reserve" specified therein. The power to fix reasonable rates ▮ for the commodity or service is in the board of commissioners, and by the Constitution it is under a duty to operate the system and supply water at reasonable rates. Constitution, art. 11, § 6. The board of commissioners may not by contract restrict or curtail the powers of future boards to determine and to fix reasonable rates. *Brummitt* v. *Ogden Waterworks Co.*, 33 Utah 289, 93 P. 828, 829; *City of St. George* v. *Public Utilities Commission*, 62 Utah 453,

220 P. 720. What rates are or in the future will be reasonable for the city to charge is a question not before us, and on which we express no opinion.

(g) It is provided that the ordinance shall "constitute a contract between the city and the holder or holders, from time to time, of the bonds or any of said bonds, and any such holder may enforce the performance of any provision hereof by appropriate action in law or equity." It is obvious that, when a city obligates itself on a bond, the transaction is a contract, and, when valid, is binding on the city to perform according to its terms. When bonds are legally issued, there is no objection to stating in the ordinance authorizing their issue that the transaction is a contract and its terms may be enforced by appropriate action in the courts. The writ will be made permanent.

ELIAS HANSEN, EPHRAIM HANSON, and MOFFAT, JJ., concur.

STRAUP, Chief Justice.

I dissent. There are two cases, *Fjeldsted* v. *Ogden City* and *Wadsworth* v. *Santaquin City* (Utah) 28 P. (2d) 161, the latter following the former in the published reports. The original prevailing opinion of the former was filed in March, 1933, but on petition for a rehearing was reheard and reconsidered in conection with the subsequent hearing of the Santaquin Case. The views thus expressed here apply to both cases and as dissents to both.

As I view the matter, the determinative factor in both cases involves the question of whether what the municipalities proposed to accomplish constitutes the creation of a "debt" or "indebtedness" within the meaning of sections 3 and 4, art. 14 of our state Constitution referred to in the prevailing opinions. If it is, the writ in both cases should be made permanent. If not, the alternative writ in both should be dismissed. Whether the effect of what the municipalities proposed and undertook to do is the creation of a

"debt" or "indebtedness" within the meaning of the constitutional provisions is dependent upon the further question of whether what is known as the "special fund doctrine" is to be applied and followed or not. We all recognize the conflict of judicial authority on the subject. Many courts, I think the trend of modern authority and by the great weight of it, approve the special fund doctrine, and in effect hold that borrowing money as proposed and undertaken by the municipalities and by issuing bonds payable exclusively out of separate or special funds derived from net revenues or income from systems of waterworks or electric light plants, etc., and without resort to taxation either special or general or in any manner rendering the bonds or loans chargeable to the general fund of the municipality and without creating any lien on the system itself or otherwise, except on the net revenues of the system, does not constitute the creation of a "debt" or "indebtedness" within constitutional provisions similar to our Constitution. Other courts repudiating and declining to follow the special fund doctrine hold to the contrary.

Though it be conceded that much may be said on both sides of the subject, yet in the case of *Barnes* v. *Lehi City,* 74 Utah 321, 279 P. 878, this court, as I think committed itself to the special fund doctrine. The case is so regarded alike by the bench and bar and by annotators. By the prevailing opinion in the Ogden and in the Santaquin Cases, the Barnes Case, especially in the former, is attempted to be distinguished chiefly on the ground that in the Barnes Case the obligation contracted and promised to be paid was substantially from revenues derived from the purchased improvements and installations, while in the Ogden Case the proposed bonds were to be payable, not alone from the net revenues derived from or by reason of the improvements and betterments to be created with the borrowed money, but from the net revenues or income derived from the whole system; and in the Santaquin Case, that an arbitrary and not a proper segregation was made of such net revenues.

When the facts in the Barnes Case and as shown by the opinion therein are fully considered and proper effect given them, I think there is no basis for such distinguishment. In the Barnes Case, Lehi City owned and operated, so the opinion recites, "a municipal electric light and power plant, but the capacity of its plant is not sufficient to supply enough electricity to light the streets of the city and at the same time permit the city to sell light or power to its inhabitants for use while the street lights are burning. To overcome this condition, and provide sufficient facilities to permit the city to furnish light and power to its inhabitants, while the street lights are being used," the city "made and adopted certain plans whereby it is proposed to enlarge the capacity of the present plant by purchasing a new 180-horse power Fairbanks-Morse Diesel engine generating unit, complete with accessories, together with transmission system" from Fairbanks, Morse & Co., "and to have that company install the same." The plan further provided that the city was to pay the company a stated price in installments "for the machinery and the labor incident to its installation * * * out of a special fund created by appropriating and setting aside all the proceeds derived by the city from the product or service of the plant," the city agreeing to adopt resolutions providing for the "creation of a special fund into which all receipts for the product or service of said plant shall be deposited."

The contract entered into or which was to be entered into between the city and the company provided that the deferred installments of the purchase price were not "a general obligation of the said municipality payable from taxes or its general funds, but only a special obligation payable from the net revenues of the light and power plant of the municipality," defining net proceeds to be the balance "of the gross receipts of the municipality's light and power plant, after payment of the legitimate and necessary expenses of the operation of the said plant," the municipality to operate the plant in an efficient and economical manner

and to maintain rates which would produce sufficient revenue to provide for the payments called for by the contract. The proposed contract further provided that the city agreed to operate the plant as a municipal plant until the obligations specified in the contract were discharged and that the company retained title and ownership in the machinery and material specified in the contract, until the purchase price was fully paid.

It thus is seen that in the Barnes Case the city owned and operated an electric light and power plant, but, finding that it was not of sufficient capacity to supply all the needs of the city and of its inhabitants, the city "proposed to enlarge the capacity of the present plant" by purchasing and having installed the machinery and improvements referred to and providing for the payment thereof exclusively out of the net proceeds of the whole plant. There, as here, it was contended that such proposed plan constituted the creation of a "debt" or an "indebtedness" forbidden by the constitutional provisions referred to, and about all the legal questions were there raised and presented as are raised and presented in the Ogden Case. As stated in the opinion, the Barnes Case was elaborately briefed by counsel for both parties and by counsel amici curiae. By the opinion, the legal points involved were rather exhaustively treated, many cases there reviewed and considered, and the court, by an unanimous opinion adopting and following the special fund doctrine, reached the conclusion that the proposed plan did not constitute the creation of a debt or indebtedness forbidden by the Constitution.

Turning now to the Ogden Case, the city there likewise was the owner of and operated a waterworks system which, because of alleged needed repairs and replacements of wornout and defective conduits and pipe lines, was inadequate to supply the city and its inhabitants with needed waters, and caused irreparable loss in the carriage and distribution of them. As recited by the board of commissioners in the ordinance adopted by it, "There is immediate and pressing

need of raising funds to the aggregate of $645,000.00 for the purpose of making repairs, improvements and extensions of the waterworks system," and to provide for public safety, general welfare, and convenience of the inhabitants of the city. The city already had a bonded indebtedness of about $1,500,000, the proceeds of which had gone in the purchase and construction of the system. But that bonded indebtedness was payable from general taxes to be levied for such purposes. No part of it was payable out of revenues or income derived from the system or out of any special fund. It was an obligation to be met by general taxes, and the city had obligated itself to levy taxes for such purposes. It further was made to appear in the Ogden Case that the city for the last six years had obtained a gross revenue from its waterworks system amounting in excess of $1,000,000, and that for such period the operating expenses of the system were about $300,000, leaving a net revenue of about $745,000," or an annual net revenue of about $124,000. But it was the custom and practice of the city to divert the whole of the revenues derived from the waterworks system and fund to the general fund of the city, and apply them to expenses of operation and maintenance of the system and in payment of retired waterworks bonds as they matured and interest on such outstanding bonds which the city had agreed and was obligated to pay by the levy and collection of taxes, and from $55,000 to $90,000 each year were thus applied in payment of general corporate obligations chargeable to and payable out of the general fund of the city; and, by so doing, no fund, at least no sufficient fund, was provided to take care of repairs and improvements as now found necessary and contemplated to be made to replenish and preserve the system. During such period no tax levy was made to pay either principal or interest on any outstanding waterworks bonds, including the outstanding bonds of $1,500,000 expressly made payable by the levy of taxes and not out of revenues derived from the waterworks system, nevertheless such obligations were met by the use

of such revenues. It further is represented in the Ogden Case that, if all the net revenues derived from the waterworks system, after payment of costs and expenses of operation, be reserved and kept in a separate and special fund, there would be a sufficient fund to take care of all the waterworks bonded indebtedness, including the issue of bonds for the contemplated loan of $645,000. The city by ordinance passed in 1915 required the revenues derived from the waterworks system to be kept in a separate fund known as the waterworks fund, and to be kept separately from other public moneys; that all costs and expenses of maintenance and operation of the system were to be paid out of such fund and the board of commissioners given power to make payment out of such net revenue fund on any principal or interest falling due upon any bonded indebtedness created in connection with the waterworks system, extensions, improvements, or betterments, and also to provide a sinking fund or funds or surplus within such waterworks fund for the purpose of providing means to discharge any such bonds and to provide priorities of any such payments, and to pay the cost of any extension to or betterments of any such water supply system which the board may order paid therefrom. But the terms and intent of such ordinance for a period of six years and more was not complied with. The revenues derived from the operation of the system were not kept separately in a waterworks fund as provided by the ordinance and not separately from other public moneys of the city, but the whole thereof was put in the general fund, and during such period, without providing any sinking fund, from $55,000 to $90,000 each year were diverted from such special fund to the general fund of the city and applied in payment of corporate obligations of the city chargeable to and payable out of its general fund.

The contemplated purpose of the proposed loan in the Ogden Case of $645,000 is to construct pipe line conduits, an additional reservoir, installations of pipe lines replace-

ments, and the installation of meters. By ordinance and by the proposed bonds themselves it is expressly provided that such loan is to be repaid by the issue of bonds of various denominations, $15,000 maturing in 1934, and the remainder on different dates between 1934 and 1953, both principal and interest of the bonds to be paid solely from net revenues derived from the operation of the waterworks system after payment of reasonable costs and expenses of operation and maintenance of the system, and not from any other funds or revenues of the city, and without incurring any obligation of the city to repay the loan by taxation or otherwise, except from the net revenues derived from the waterworks system. The proposed bonds on their face so provide. By the proposed plan the city covenanted that, so long as any of such bonds remained outstanding and unpaid, to charge and collect sufficient reasonable rates for the use of water from the system for the payment thereof, the bonds themselves until paid to be a lien on the net revenues from the waterworks system, prior to any lien thereon which may be given to any other bonds or other obligations subsequently issued by the city. No lien for the payment of any such bonds or loan was to be given or contemplated on the waterworks system itself, or on any part thereof or otherwise, except on the net revenues derived from the operation of the system.

It thus is seen that in the Barnes Case the machinery and improvements were to enlarge the capacity of the plant owned and operated by the city, the purchase price thereof and the obligation of the city to be paid not only out of the increased net revenues derived from such improvements but from net revenues derived from the whole plant. In the Ogden Case the proposed loan and bonds to be issued were payable, not only from increased net revenues derived from the proposed improvements to be created with the proceeds of the loan, but also from the net revenues derived from the whole waterworks system. In each case the city obligated itself to charge and collect sufficient reasonable rates to meet such payment. In each, if the city failed to do so, it

no doubt by proper judicial proceedings could be required so to do. The provision in the contract in the Barnes Case that the title and ownership of the installed improvements should remain in the company until paid for in no sense prevented such judicial action. In neither case was the obligation a lien on the plant or waterworks system itself, or payable by taxation or out of the general fund of the city or otherwise than out of the special fund of net revenues derived from the operation of the plant or system.

But in the Ogden Case, and adhered to in the Santaquin Case, barriers by way of restrictions and limitations are urged against the special fund doctrine, especially on authority of the case of *Garrett* v. *Swanton*, 216 Cal. 220, 13 P. (2d) 725, 728, known as the Santa Cruz Case. The court there recognized and approved, as does the prevailing opinion in the Ogden Case, the special fund doctrine. Says the California court:

"This so-called 'special fund' doctrine finds ample support in the decisions of other jurisdictions where constitutional debt limit provisions similar to the one here involved exist. It seems to be the majority rule in other jurisdictions that a limitation upon municipal indebtedness is not violated by an obligation which is payable out of a special fund, if the municipality is not liable to pay the same out of its general funds should the special fund prove to be insufficient, and the transaction by which the indebtedness is incurred cannot in any event deplete the resources of the municipality."

Texts and numerous cases from different jurisdictions, including the Barnes Case, are cited in support thereof, and cases from Idaho which refuse to follow the "special fund" doctrine. Further said the California court: "The recent decisions of this court would seem to leave no room for doubt that the 'special fund' doctrine has been adopted in this state," citing *Shelton* v. *City of Los Angeles,* 206 Cal. 544, 275 P. 421, and *In re California Toll Bridge Authority,* 212 Cal. 298, 298 P. 485.

However, the court then in the Santa Cruz Case further proceeds on the theory that, inasmuch as the contemplated improvements were not payable exclusively out of net in-

creased revenues or net revenues derived alone from the improvements, but from net revenues derived from the whole plant, and inasmuch as by ordinance (referred to in the opinion) moneys derived from the waterworks system were required to be used in payment of general obligations of the city, the conclusion was reached that the city either directly or indirectly would be required to "feed the special fund" from other revenues or sources of the city whereby the taxpayers either directly or indirectly became liable to pay the obligation incurred by the levy of taxes for such purpose, and hence the obligation incurred was a debt forbidden by the Constitution. With respect to the ordinance the court said:

"By the very terms of the ordinance relied upon, as above quoted, the revenue from the water plant is likewise to be used to pay the interest and principal on the bonds, which are general obligations of the city. If this fund is depleted, the obligation to feed the fund will fall upon the taxpayer. Respondents state: 'The money in the special fund cannot be placed in the general fund, nor used for charges to be met from tax-raised funds.' Such a contention is directly in the face of the terms of the ordinance relied on by respondents, because that ordinance specifically states that the money in the water fund shall be used to pay a general obligation of the city; namely, the interest and principal on the bonds."

In support of the conclusion reached in the Santa Cruz Case imposing a restriction or limitation on the special fund doctrine, cases chiefly are cited which either repudiate the special fund doctrine or question the soundness of it and endeavor to get away from it. Whatever room there may be for different opinions as to the correctness of the result reached in the Santa Cruz Case, the reasons there stated and which influenced the decision do not, as I think, apply to the Ogden nor to the Santaquin Case. In neither was the city required or obligated to use "money in the water fund to pay a general obligation of the city." In neither is there any "feeding" or the requirement of any "feeding" of the special fund by taxation or from other revenues of the city. Indeed, the opposite is true, especially in the

Ogden Case. There, as has been seen, for many years from $55,000 to $90,000 each year were diverted from the net revenues of the special fund and put in the general fund of the city to defray and pay general corporate obligations of the city, thus "feeding" the general fund with revenues from the special fund. There lies the rub. The petitioners desire such custom and practice to continue, fearful that, if the general fund no longer is "fed" from moneys of the special fund, the former may be required to be augmented by general taxes, licenses, or from other revenues or sources of the city. Let it be assumed that, notwithstanding the ordinance of 1915 creating a special waterworks fund and requiring such fund to be kept separately from other public moneys of the city, it was competent for the city temporarily to loan or transfer money from one fund or department to another, yet whether the city could properly do so to pay general corporate obligations of the city without returning an equivalent amount of moneys to the special fund from which it was diverted may for various apparent reasons present another question. Annotations, 70 A. L. R. 431. But we need not now bother about that, for it certainly was competent for the city to create such special fund from the waterworks system and even provide that the whole thereof be applied to maintenance and operation of the system and to obligations created in connection therewith.

In the next place, by the plan proposed in the Ogden Case and upon the face of the bonds themselves, it is expressly provided that the bonds are payable both as to principal and interest solely from revenues derived from the operation of the waterworks system, after payment of costs and expenses of operation and maintenance, and not from any other funds or revenues of the city. And holder of any of the proposed bonds for payment of either principal or interest was required to look alone to the net income of such special fund, and, if not sufficient for such purpose, the city, neither by taxes nor from any other source or revenue, was required to "feed" the special fund. It, however, is

urged that at the time of the proposed plan and loan there was in connection with the waterworks system a bonded indebtedness or obligation of $1,500,000, and, if there were not sufficient net funds derived from the waterworks system to pay the proposed $645,000 loan and the principal and interest as they became due of the prior bonded obligation of $1,500,000, the city would be required to levy taxes to pay such prior obligation. But let it not be overlooked that such prior obligation was expressly payable by the levy of taxes and out of the general fund of the city, and not out of revenues derived from the waterworks system. Such existing obligation would not in any manner be enlarged or diminished nor affected by the proposed plan. What the petitioners contend, if the loan is permitted, is not that the special fund or net revenues of the waterworks system would require to be "fed" by taxes or from other revenues of the city, but that the city would be deprived from using moneys of the special fund to apply in payment of general obligations chargeable to its general fund, and hence the city might be required to resort to taxes or other sources to augment its general fund. In other words, it in effect is urged that the loan be not authorized and the city permitted to continue to fix and collect rates from water users and consumers, not only to defray the costs and expenses of operation and maintenance and meet obligations created in connection with the system payable out of such revenues, but also to provide a fund with which to pay, or apply on general or other corporate obligations of the city, and thus continue "to feed" the general fund from moneys of the special fund.

But further as to this. If the loan is not made and the revenues derived from the waterworks system wholly applied to the cost and expenses of the operation and maintenance of the system and the surplus set aside for a sinking fund with which to make the contemplated repairs, improvements, and replacements as fast as such surplus will admit, and the interest and principal as they mature on the

$1,500,000 bonded obligation met by taxation as the city prior to the proposed plan lawfully had agreed and obligated itself to do, and none of the surplus of the special fund diverted to the general fund for general corporate purposes, I do not well see on what legal ground taxpayers could complain, when as here made to appear that the conduit and pipe lines and other structures of the system through long usage had become in such worn-out and defective condition as to require replacement and repair to economically distribute the waters of the system to water users and consumers, and thereby avoid the great loss and waste of waters now resulting from the present condition of the system. If the surplus of such special fund may be so used, as I think it may, without creating any debt or indebtedness forbidden by the Constitution, I see no valid legal reason why such surplus may not also be used by the proposed and contemplated plan without incurring a debt or indebtedness forbidden by the Constitution. To say that in the one method no debt or obligation is created, while in the other a debt is created, begs the question, for in both methods the making of the improvements, repairs, and replacements is accomplished solely with moneys from net revenues of the special fund without resort to taxes or other funds or revenues of the city, and thus is in accordance with the essential and underlying principles upon which the supecial fund doctrine is founded.

The limitation or restriction placed on the special fund doctrine in the Ogden Case has its initiative in the case of *Joliet* v. *Alexander,* 194 Ill. 457, 62 N. E. 861, followed in the case of *Schnell* v. *City of Rock Island,* 232 Ill. 89, 83 N. E. 462, 14 L. R. A. (N. S.) 874, and followed and relied on in *Garrett* v. *Swanton,* supra, and in about all the cases including the Ogden Case applying such limitation or restriction. But the Joliet and the Schnell Cases were overruled by subsequent Illinois cases [*Maffit* v. *City of Decatur,* 322 Ill. 82, 152 N. E. 602; *Ward* v. *City of Chicago,* 342 Ill. 167, 173 N. E. 810; *City of Jerseyville, Ill.,* v. *Connett* (C.

C. A.) 49 F. (2d) 246] and thus no longer are binding authority in that jurisdiction. Said the New Mexico court in the very recent case of *Seward* v. *Bowers*, 37 N. M. 385, 24 P. (2d) 253, 259, where the special fund doctrine by elaborate opinions and on a review of numerous cases there cited was considered, and where the limitation or restriction put upon the doctrine in the Ogden Case was repudiated, that: "It is worthy of mention that the Joliet Case from Illinois, the first to sense and promulgate this distinction in and limitation on the right to pledge revenues, has since been definitely rejected on this point in the jurisdiction which gave it birth" citing *Ward* v. *City of Chicago*, supra, *Maffit* v. *City of Decatur*, supra, and *City of Jerseyville, Ill.*, v. *Connett*, supra.

Further said the New Mexico court, after a review of the decisions: "So that, for clearcut holdings sustaining the distinction, so far as my research discloses, we are confined to the courts of California, Missouri, and the United States Circuit Court of Appeals of the Eighth Circuit. Against this line of decisions we find arrayed the courts of the following jurisdictions, to wit: *Winston* v. *City of Spokane*, 12 Wash. 524, 41 P. 888; *Griffin* v. *City of Tacoma*, 49 Wash. 524, 95 P. 1107; *Barnes* v. *Lehi City*, 74 Utah 321, 279 P. 878; *Lang* v. *City of Cavalier*, 59 N. D. 75, 228 N. W. 819; *City of Bowling Green* v. *Kirby*, 220 Ky. 839, 295 S. W. 1004; *Jones* v. *City of Corbin*, 227 Ky. 674, 13 S. W. (2d) 1013; *Ward* v. *City of Chicago*, 342 Ill. 167, 173 N. E. 810, 812; *Searle* v. *Town of Haxtun*, 84 Colo. 494, 271 P. 629; *City of Jerseyville, Ill.*, v. *Connett* (C. C. A. 7th Cir.) 49 F. (2d) 246, 249; and apparently also *Brockenbrough* v. *Board of Water Commissioners*, 134 N. C. 1, 46 S. E. 28, 34."

In harmony with and supporting such last cited cases may also be added the following cases: *Underwood* v. *Fairbanks, Morse & Co.* (Ind. Sup.) 185 N. E. 118; *Mississippi Valley Power Co.* v. *Board of Improvement, Water Works Dist. No. 1, of Van Buren*, 185 Ark. 76, 46 S. W. (2d) 32; *McCutchen* v. *Siloam Springs*, 185 Ark. 846, 49 S. W. (2d)

1037; *Kelly* v. *Minneapolis*, 63 Minn. 125, 65 N. W. 115, 30 L. R. A. 281; *Williams* v. *Kenyon*, 187 Minn. 161, 244 N. W. 558; *Carr* v. *Fenstermacher*, 119 Neb. 172, 228 N. W. 114; *Kasch* v. *Miller*, 104 Ohio St. 281, 135 N. E. 813; *Butler* v. *Ashland*, 113 Or. 174, 232 P. 655; and in effect, *State* v. *Portage*, 174 Wis. 588, 184 N. W. 376.

There, of course, are cases, including the Idaho and other courts, which repudiate the special fund doctrine entirely and decline to follow it. However, since the special fund doctrine is not, as claimed, repudiated in its entirety by the Ogden Case, only a limitation or restriction put upon it, the citation of cases which wholly repudiate the doctrine has no application to the matter in hand. Other courts have refused to apply the doctrine where the loan or bonds by mortgage or otherwise are made a lien on the corpus of the entire plant or system or on other property of the city and not merely a lien on the special fund derived from the net revenues of the plant or system, a feature not here present, for no lien of any kind is given or contemplated on the corpus of the plant or system or on any part thereof, only a lien on the net revenue derived from the operation of the plant or system which, by the great weight of authority, may be done without offending constitutional provisions similar to our Constitution. Notes, 72 A. L. R. 697 and cases heretofore cited.

I think there is an irreconcilable conflict of the opinions in the Ogden Case and in the Barnes Case. The matter was so regarded by most of the nine or ten counsel appearing for the parties and as friends of the court in the presentation and arguments in the Santaquin Case and reargument of the Ogden Case, some urging that the Barnes Case should be overruled, others that it be followed and the opinion of the Ogden Case reversed, and a few contending there is no conflict. I am of the opinion that the Barnes Case should be adhered to; that the special fund doctrine should be applied and followed without the limitations or restrictions imposed in the Ogden Case; that by the great weight of

modern authority the plan proposed and contemplated by both cities is not the creation of a debt or an indebtedness forbidden by the constitutional provisions referred to; and hence that the alternative writs issued in both cases should be dismissed.

Having reached such conclusion, it is unnecessary to express any opinion concerning the so-called "Granger Act" (Laws 1933 [2d Sp. Sess.] c. 22) nor the recent constitutional amendment referred to in the prevailing opinion in the Santaquin Case. It is apparent that the Granger Act, passed since the filing of the opinion in the Ogden Case, but still pending and undetermined on petition for rehearing, is but a legislative struggle in an attempt to devise some means whereby the special fund doctrine, notwithstanding the Ogden decision, may be rendered applicable and operative under circumstances and conditions involved in that case, or an effort to curtail the effect of the decision and still permit the municipality and other municipalities under similar conditions to go forward with a plan or plans similar to that proposed in the Ogden Case. I do not think that the Granger Act gives any aid to the situation, for, if the proposed plan creates a debt or an indebtedness within sections 3 and 4 of article 14 of the Constitution which are not affected by the recent amendment to the Constitution, not anything the Legislature may do can overcome the effect thereof, and, if the proposed plan is not a debt or indebtedness forbidden by the Constitution, the Granger Act adds nothing to it but confusion, for whether the proposed plan creates such a debt or indebtedness or not is, as stated in the prevailing opinion, a judicial and not a legislative question. And whichever way that question is judicially determined determines the issue in both cases. I further am of the opinion that much that is said in the Santaquin Case concerning the powers of municipalities in view of the recent amendment to the Constitution is unnecessary and gratuitous, and ought not to be regarded of binding effect when and if in future cases such questions as there con-

sidered are presented and involved. Nor if the opinion in the Ogden Case with respect to the limitation or restriction put upon the special fund doctrine shall prevail and become the rule of this court, I do not concur in the conclusion reached nor the reasons given therefor in the Santaquin Case on the subject or method of segregation of revenues derived from the waterworks system, and, further, I do not see how the making of such segregation is practicable or within any degree of certainty, and in the Ogden Case it in effect was represented and conceded that it was impracticable, if not impossible, if the improvements were made, and the plant operated with them, to determine what of the net revenues derived from the system were attributable to or occasioned by the improvements and what from other portion or portions of the system. No matter what method be adopted, the determination of the segregation to a large extent must be made arbitrarily or conjecturally. *Seward* v. *Bowers,* supra; *Searle* v. *Town of Haxtun,* 84 Colo. 494, 271 P. 629.

### On Petition for a Rehearing.

PER CURIAM.

A petition for rehearing and brief in support thereof were filed by the attorney for Ogden City, the Attorney General of the state, and city attorneys of four municipalities also filed a brief as amici curiae. Arguments in support of the petition for rehearing in this case were heard at the same time the case of *Wadsworth* v. *Santaquin City* was presented to the court. Counsel for all the parties in both actions as well as counsel amici curiae made full presentation by briefs and arguments at the one hearing.

Our views on rehearing are expressed in the opinion of the court in the case of *Wadsworth* v. *Santaquin City* and the dissenting opinion of Mr. Chief Justice STRAUP in the case.

The petition for rehearing is denied.

STRAUP, C. J., dissents on grounds stated in his dissenting opinion.

EPHRAIM HANSON, Justice (dissenting).

I concurred in the prevailing opinion filed in this case. Since the reargument of the case in connection with the Santaquin Case and upon re-examination and further consideration thereof, and especially of the citations of the additional authorities repudiating the limitation of the special fund doctrine imposed in the Ogden City Case, I am now persuaded that a rehearing in that case ought to have been granted and the alternative writ theretofore issued dismissed.

I have arrived at such conclusion on the ground that, if the bonds are issued, they are not obligations of the city as a corporate entity, nor a lien on the waterworks system or on any other property of the city. No tax can be levied to pay either the bonds or the interest thereon. Such bonds and interest must be paid out of the net income from the operation of the plant. If such obligation cannot be discharged in that manner, then it cannot be discharged at all so far as the municipality is concerned. No power is imposed upon the city to discharge the obligation by the levy of taxes, or a resort to any funds or revenues of the city except the income from the net proceeds derived from the operation of the plant. If, therefore, the city cannot be coerced or required to pay the obligation, it, according to the manifest weight of authority, is not a debt falling within the provisions of sections 3 and 4 of article 14 of our Constitution.

I entertain the same views in respect of the Santaquin Case.

I therefore think the alternative writs in both cases should be dismissed.