**TOWN OF TERRELL HILLS et al.,**
Appellants,

v.

**CITY OF SAN ANTONIO, Texas, Appellee.**

No. 13349.

Court of Civil Appeals of Texas.

San Antonio.

Oct. 29, 1958.

Rehearing Denied Nov. 26, 1958.

Charles E. Biery, San Antonio, for appellants.

Carlos C. Cadena, City Atty., J. D. Wheeler, Robert Sawtelle, San Antonio, for appellee.

POPE, Justice.

The Town of Terrell Hills, Texas, and the Town of Olmos Park, Texas, are incorporated cities located in Bexar County. They and certain individuals sued the City of San Antonio, Texas, by a class action to enjoin the city from charging and collecting from persons outside the city limits, water rates which were higher than those charged its residents. The court denied the injunction and made findings in support of its judgment. The controlling point in the case is whether the City of San Antonio has unreasonably discriminated against persons who reside outside the city.

San Antonio is a home rule city which operates under a charter. On May 1, 1925, the city bought a privately owned water supply company and paid for it by proceeds from revenue bonds. It is not supported by taxation. From 1925 to 1930, water patrons outside the City of San Antonio were paying exactly double the rate paid by those inside the city. Rates varied as the amount of water increased, but even the larger water users outside the city paid fifty per cent more than residents. In 1931 non-resident rates were decreased, but even then non-residents paid from fifty to eighty-five per cent more than residents. In 1934, the rates for non-residents were again decreased, but still they were from fifty to seventy-eight per cent higher outside the city. In 1950, the rates were again decreased, but still, depending upon the amount of water used, were from twenty to fifty per cent higher. In 1953, the rates were from thirteen to fifty per cent higher for non-residents than for residents. In 1956, the City of San Antonio passed an ordinance which fixed the water rates so that non-residents paid from twenty-nine to thirty per cent more than residents.[1] Those are the rates here under attack.

In 1953, city employed Black and Veach, a firm of engineers, to make a comprehensive analysis of the San Antonio Water System. This firm studied the matter for three years, and, among other things, found that the cost of service to non-residents was about thirty-five per cent more than similar services to residents. They also recommended that the city issue revenue bonds in excess of twenty million dollars for permanent replacements, improvements and extensions, and to pay off outstanding bonds. Two public hearings were conducted concerning the proposed rates. After the first hearing the City Council employed public accountants to check the Black and Veach report. The accountants, after study, recommended that the rates for non-resident patrons should be fifty per cent, rather than thirty-five per cent, higher than those of residents.

The trial court found as a fact that continuously since 1925, when San Antonio bought the water utility, the city had recognized the non-resident rate status of persons outside the city; and further found these factors as justifying a classification of customers and a rate differential: (1) The cost of meter reading is substantially greater outside the city than within the

1.

Monthly Minimum Charges

| Meter Size | Water Allowance Cubic ft.-Equiv. Gals. | | Inside City Limits Minimum Monthly Charge | Outside City Limits Minimum Monthly Charge | % Differential |
|---|---|---|---|---|---|
| 5/8″ | 500 | 3750 | 1.00 | 1.30 | 130 |
| 3/4″ | 1500 | 11250 | 2.70 | 3.50 | 129.6 |
| 1″ | 2000 | 15000 | 3.55 | 4.60 | 129.5 |
| 1-1/2″ | 4000 | 30000 | 6.95 | 9.00 | 129.4 |
| 2″ | 6000 | 45000 | 10.35 | 13.40 | 129.46 |
| 3″ | 13000 | 97500 | 19.25 | 25.20 | 130.9 |
| 4″ | 20000 | 150000 | 27.65 | 36.40 | 131.64 |
| 6″ | 48000 | 360000 | 49.75 | 65.10 | 130.65 |
| 8″ | 80000 | 600000 | 72.15 | 93.90 | 130.14 |

city. (2) The stand-by water demand required outside the city is substantially greater than inside the city. (3) Rates outside the city should be based upon a seven per cent return on the fair valuation of that portion of the plant value allocated to water users outside the city. Rates for residents were based upon a seven per cent return on the fair valuation of that portion of the plant value allocated to water users inside the city, but the city waived three per cent of this. (4) In formulating the rates outside the City of San Antonio, a substantial charge was made for fire protection through fire hydrants and maintaining sufficient water pressure for such service. No similar charge is made inside the city.

After the hearings and after considering the two reports, city adopted the ordinance which set the water rates for non-residents about thirty per cent higher than those for residents. The result of the differential is that Terrell Hills and Olmos Park pay about $54,800 more for water than they would pay if they were charged the rates charged inside San Antonio.

■ Geographically, Terrell Hills and Olmos Park lie in the northern portion of the City of San Antonio, and, like islands, are surrounded by the City of San Antonio. Portions of San Antonio extend as far as four miles beyond the limits of the complaining towns. Hence the towns, though outside the city limits, are inside the outer limits of the city. Because of this situation, appellants rely strongly upon City of Texarkana v. Wiggins, 151 Tex. 100, 246 S.W.2d 622. In that case the Supreme Court held that a city could not discriminate against non-residents when the sole grounds for the differential was that water was being furnished beyond the city limits. Whereas, that was the only basis for the differential in that case, it is not the grounds relied upon in this case at all. "It is well established that a municipal corporation operating its water works or other public utility has the right to classify consumers under reasonable classification based upon such factors as the cost of service, the purpose for which the service or product is received, the quantity or amount received, the different character of the service furnished, the time of its use or any other matter which presents a substantial difference as a ground of distinction." Caldwell v. City of Abilene, Tex.Civ.App., 260 S.W.2d 712, 714. Not every discrimination is illegal, but only that which is unreasonable. Gillam v. City of Fort Worth, Tex.Civ.App., 287 S.W.2d 494.

■ Article 1108, § 3, Vernon's Ann. Civ.St., gives cities the power to extend their lines outside their limits and to sell water, and it permits cities "to connect therewith under contract with such town or city under such terms and conditions as may appear to be for the best interest of such town or city." City of Texarkana v. Wiggins, supra, interprets the statute to mean that at the time a city makes its original connection to customers outside the city limits it may then fix such service charges as it decides the situation requires and the rate may be higher for non-residents than for residents. Because the Supreme Court expresses this as the meaning of the statute, it follows that in limine, at least, there may be a valid classification between non-residents and residents. This, says the Court, is the establishment of a rate status between the city and its outside customers. In City of Texarkana v. Wiggins, rates at the beginning were the same for the two classes, whereas, in this case the historical rate status, from the beginning and for thirty-one years, was one in which the city charged non-residents considerably more than residents, in some instances as much as double, and never less than ten per cent more. This alone is enough to affirm the judgment of the trial court. Botkin v. City of Abilene, Tex.Civ.App., 262 S.W.2d 732.

The majority opinion in City of Texarkana v. Wiggins, supra, gives the statute a more limited interpretation than does the minority but it appears that the statute itself classifies customers as residents and non-residents. There are good reasons for this statutory classification of residents and non-residents in the case of a city owned utility. Even in a case, such as this, where the utility is supported by revenues instead of taxes, it is the city that bears all of the burdens and responsibilities of management. Louisville & Jefferson County Metropolitan Sewer Dist. v. Joseph E. Seagram & Sons, 307 Ky. 413, 211 S.W. 2d 122, 4 A.L.R.2d 588. A city utility which furnishes water to both its own residents and non-residents at the same rates, indirectly imposes a burden upon its residents which non-residents in no way share. City areas which have utility connections have higher valuations than areas which do not have the utility. The city levies and collects its taxes upon this enhanced value. Non-resident areas, however, not being taxable at all, receive the same benefits of enhanced value from utility connections but bear no part of this additional burden. Faxe v. City of Grandview, 48 Wash.2d 342, 294 P.2d 402. Assuming a situation where the water rates are exactly equal for residents and non-residents, the mere fact that water is furnished would impose a tax burden upon enhanced valuations of residents which non-residents would entirely escape.

Looking more specifically to the other classifications, however, the trial court found as facts, which findings have support in the record, that four differences between residents and non-residents justify the rate differential. Assuming that the court may or even should have made different and contrary fact findings, appellants have challenged only two of the findings. They challenge the finding that the cost of meter reading is substantially greater outside the city than within the city. They challenge the finding that the standby water demand required outside the city is substantially greater than inside the city. Appellants argue that the most the evidence shows in support of the finding of extra cost to read meters is that it takes readers forty per cent longer to read meters in Olmos Park and Terrell Hills than inside the city. Appellants then compute this additional cost to the city at $3,120 per year, and concede that, based on that distinguishing cost factor alone, a six per cent rate differential is justified. One of the unchallenged findings is that in formulating the rates outside the city, a substantial charge was made for fire protection through fire hydrants and maintaining sufficient water pressure for such service, though no similar charge for this same fire protection was made inside the city. In Village of Fox Point v. Public Service Commission, 242 Wis. 97, 7 N.W.2d 571, 573, there was a twenty-five per cent higher rate for non-residents who were furnished with fire protection service. This differential was approved, the Court saying: "Fire protection is an expensive service rendered by the utility, because it involves having an adequate supply of water ready at all times regardless of whether it is actually used. The utility decided, as it might properly do, to collect its expense of this sort from appellant by including a charge in the general rate. The City of Milwaukee cannot tax the suburb or its inhabitants as it does the taxpayers within its limits to pay for this service." See 4 A.L.R.2d 598.

■ If we disregard the other factors entirely, the six per cent differential, based on actual additional cost of meter reading, and the fire protection service, would justify the thirty per cent differential.

In Village of Fox Point v. Public Service Commission, supra, the rate of return figured for residents was two per cent, but for non-residents it was four per cent. A reasonable return was five and one-half per cent. The Court held that a difference in the rate of return was not unlawful when the rate standing by itself was not unrea-

sonable. See, also, Borough of Ambridge v. Pennsylvania Public U. Comm., 137 Pa. Super. 50, 8 A.2d 429. In this case there was a difference of three per cent between the rate of return charged residents and non-residents, but the rate of return standing by itself was not unlawful.

Since the rate differential was recognized from the beginning, City of Texarkana v. Wiggins, supra, and since at least some of the factors considered by the trial court justify a rate differential of thirty per cent, we affirm the judgment.