## Evelyn Barr et al. *v.* First Taxing District of the City of Norwalk

Baldwin, C. J., King, Murphy, Shea and Alcorn, Js.

Argued May 8—decided July 25, 1963

54

*Sidney Vogel,* with whom, on the brief, was *Robert B. Seidman,* for the appellants (plaintiffs).

*Harry H. Hefferan, Jr.,* with whom was *Fred L. Griffin,* for the appellee (defendant).

MURPHY, J.   The plaintiffs are residents of the city of Norwalk who reside outside the limits of the first taxing district and obtain the water they require for domestic consumption and use from facilities maintained by that taxing district, which together with the second taxing district acquired the exclusive right, under legislation adopted in 1929, to service the area in which the plaintiffs live. 20 Spec. Laws 1064, No. 471.   On behalf of themselves and other customers similarly situated, the plaintiffs instituted this action, in which their main allegation is that the water rates charged them are substantially higher than those charged customers residing within the first taxing district and are discriminatory and unlawful.   The plaintiffs sought to enjoin the district from continuing the discrimination and demanded damages for excess payments made after December 1, 1952.   By stipulation, the parties limited the issue at trial to that of liability,

i.e. whether the charges were discriminatory and unlawful. Therefore, we purposely eliminate reference to the other allegations in the complaint and the relief sought except as reference to them is necessary for the review of the rulings on demurrer. The trial court concluded that the plaintiffs had not sustained their burden of proof and rendered judgment for the defendant. The plaintiffs have appealed.

The first taxing district comprises the territory occupied by the old city of Norwalk prior to its consolidation by charter in 1913 with other municipal bodies within the territorial limits of the town of Norwalk to form the present city of Norwalk. 16 Spec. Laws 1038 § 3, 1040 § 4. The district was constituted a body politic and corporate and succeeded to the ownership, control and operation of the waterworks of the old city. 16 Spec. Laws 1041, § 11. The management, operation and expansion of the system are vested in a board of commissioners elected by the electors of the district. 16 Spec. Laws 1041 § 11, 1042 § 13; 21 Spec. Laws 268. The board has the power and authority to make rules and regulations regarding the use and distribution of water and to establish the prices to be paid therefor. 21 Spec. Laws 268. All property and persons liable to taxation in the district are subject to taxation to make up any deficiency when the income from water rents is inadequate to meet the current expenses of the waterworks and the interest on the outstanding indebtedness incurred for these facilities. 16 Spec. Laws 1044, § 17.

Since 1929, the first taxing district, that is, the defendant, has, under an agreement with the second taxing district, had the exclusive right to provide and sell water in the plaintiffs' area, which is in

what will hereinafter be called the outer district. The defendant maintains two classes of service, one being domestic or residential and the other industrial, in both the outer district and the first taxing district proper, which will be called the inner district. The rates relating to industrial users are not in issue. In 1933, the supply to the 2056 domestic customers in the inner district was metered, while the 1611 domestic outer-district customers were charged a flat rate. At that time, the entire system was fed by gravity. Since then, the population in the outer district has increased considerably, but that of the inner district has been practically static. In 1958, there were 2641 inner-district domestic customers as compared to 5277 in the outer district. The supply to the outer-district customers has been metered since 1953. The growth in the outer district has necessitated considerable expansion of the defendant's facilities. None of this expansion was required for inner-district demand. Included in the additions to the system since 1946 are a million-dollar reservoir and dam, a high-pressure system, booster pumps, distribution mains, a well development, and two one-million-gallon standpipes. All of these expansion projects have been financed by general obligation bonds of the defendant which were authorized by special acts of the legislature and on which the taxpayers and all of the property in the first taxing district are secondarily liable. The income of the water department has never been insufficient to pay the annual carrying charges on these obligations.

There has always been a differential between the rates charged in the inner district and those charged in the outer district. At the time of trial, the inner-district rate was 25 cents per 1000 gallons,

with a minimum of $1 per month or $12 per year. The outer-district rate was 50 cents per 1000 gallons, with a minimum of $2 per month or $24 per year. That the inner-district consumers receive preferential treatment in the matter of water rates is apparent on the surface. Our responsibility is not to determine whether the rates charged the plaintiffs are so unreasonable when compared to the inner-district rates as to be discriminatory but rather to decide whether, on all the evidence introduced at the trial, the court was obliged to find that the plaintiffs had established by a fair preponderance of the evidence that the differential in the rates resulted in an unfair and injurious distinction to the plaintiffs' detriment.

In addition to the facts stated, it was found also that the customers in the inner district are in what constitutes a compact area, where the customer density is much greater than in the outer district. The latter is spread over a much larger terrain, and while there are more customers in the outer district, they are located much farther apart than those in the inner district. The outer district is hilly and rocky as compared to the inner district. The result is that the increased costs of installation, the additional lengths of mains between customers, and the need of pumping facilities make it more expensive to provide and maintain the system and the service in the outer district. Other factors in support of a differential in rates were presented to the court, but a detailed recital of them would unduly lengthen this opinion, and therefore we do not deem it necessary to recount them.

The plaintiffs and the defendant relied on evidence presented by expert witnesses. The plaintiffs' expert characterized himself as a utility and finan-

cial consultant. He had not made a professional study of a municipally owned water utility prior to this case and did not make a cost allocation study in this instance. E. Irvine Rudd, the defendant's expert, is a civil engineer who served as chief engineer for the state public utilities commission for twenty-eight years prior to his retirement in 1945 and who has been engaged exclusively since then in cost-study work in both publicly owned and municipally owned gas, electric and water companies. Four of the municipal utilities for which he made cost studies are in New England, two of them being municipal water departments in this state. It was the opinion of Rudd that the inhabitants of a municipality which operates a water department are entitled, because of their liability upon the bonded indebtedness, to lower rates than outside customers. Both experts agreed that there is a zone of reasonableness within which rates can be set. Rudd made a cost study of the defendant's operations for 1958. Based on that study, he concluded that the return received by the defendant from the outer district was within the zone of reasonableness. The court adopted this conclusion as a finding. The plaintiffs assign error in this finding in that it was found without evidence. In their brief, they assert that it is a conclusion rather than a finding of fact. We construe this finding to mean that the rates charged the plaintiffs are not unreasonable. Whether a rate is reasonable or unreasonable is primarily a question of fact, depending largely on the circumstances of the particular case. *New Haven* v. *New Haven Water Co.,* 118 Conn. 389, 402, 172 A. 767. A reasonable rate for nonresident users should include fair compensation for the services rendered and should yield a fair return

to the municipal supplier on the value of the property as a going concern used for the public. A reasonable discretion must abide in the officers whose duty it is to fix rates, and their decision should not be set aside unless it is proved that the rates are excessive and their action illegal and arbitrary. *Faxe* v. *Grandview,* 48 Wash. 2d 342, 351, 294 P.2d 402.

The main thrust of the plaintiffs' claim is that it is unlawfully discriminatory to charge a higher rate to nonresidents than to residents. It has been generally held that a municipally owned waterworks supplying water outside its corporate limits may, generally, charge more for that service than it charges the users who reside within the corporate limits. The subject is annotated in 4 A.L.R.2d 595, 598, to which reference may be made. The charge, however, to the customers outside the corporate limits should not be unreasonably high. *New Haven* v. *New Haven Water Co.,* supra, 412. Proof that there is a rate differential in favor of residents does not establish prima facie that nonresident rates are unreasonable. *Faxe* v. *Grandview,* supra, 353. The burden was on the plaintiffs to show that the rates were unreasonable. *Souther* v. *Gloucester,* 187 Mass. 552, 556, 73 N.E. 558. It is readily apparent that the trial court gave more credence to the testimony of the defendant's expert than to that of the plaintiffs' expert. Conflicts in opinion evidence offered by experts arise frequently in the trial of cases, and the trier has the duty of deciding which to credit. *Humphrys* v. *Beach,* 149 Conn. 14, 20, 175 A.2d 363. Upon the record presented to us, we cannot say that it was error for the trial court to conclude that the plaintiffs failed to prove their case.

In the fourth count of their complaint, the plaintiffs alleged that the rates charged them had not been set after a duly warned public hearing at which all users of the waterworks and the owners of property served or to be served thereby had an opportunity to be heard, pursuant to statute. The demurrer interposed by the defendant to this count was sustained. The plaintiffs have assigned error in this ruling. The charter of the city makes no provision for a public hearing on the rates to be set by the board of commissioners. 21 Spec. Laws 268. The plaintiffs rely on chapter 102 of the General Statutes. This chapter was enacted in 1933 as Public Act No. 312 and has remained unchanged. It applies to municipal waterworks financed by the issuance of revenue bonds. The plaintiffs did not allege that the defendant's system was so financed. In the absence of such an allegation, the demurrer was well taken. Revenue bonds are paid solely from the net revenue of the system and are not obligations of the municipality. General Statutes § 7-235. Furthermore, as has been pointed out, the bonds issued to finance the improvements and expansion of the defendant's system are general obligation bonds of the defendant to which the revenue from the system is to be applied first.

The defendant filed two special defenses to the complaint in addition to an answer which in effect amounted to a general denial. These defenses alleged that the rates charged the plaintiffs did not produce an unfair or exorbitant return to the defendant and that they were similar in amount to those charged other suburban consumers similarly situated. The court overruled the demurrer to the special defenses. As the plaintiffs alleged that the rates were unreasonable and discriminatory, it was

incumbent upon them to prove those allegations, and the defendant under its general denial could offer counter evidence of the reasonableness and fairness of the rates. Practice Book § 102. The special defenses were unnecessary. The error in overruling the demurrer is harmless, however, in the light of the trial court's conclusion that the plaintiffs had not proved that the rates were unreasonable and discriminatory.

The foregoing discussion disposes of the issues raised by the appeal. We believe, however, that some comment is warranted on the report submitted to the defendant by its expert, Rudd. This report was a comprehensive analytical survey of the defendant's facilities and operations, with recommendations for improvement. Prior to the institution of this suit no such survey had been made. The report disclosed that, in Rudd's opinion, revision in rates for all classes of service in both the outer and inner districts should be made to produce more revenue and to reduce the disparity between the outer- and inner-district charges. He found that the income from the payments made by the city of Norwalk for hydrant service in the inner district was $13,000 less than the expense of this service. No revenue was received for hydrant service in the outer district except for about $2000, paid by the city for this service in the part of the outer district which is within the fourth taxing district. The unreimbursed cost of fire hydrant service in the outer district amounted to over $30,000 in 1958. The unit revenues from the meters for all classes of service in the outer district were 1.54 times those from all classes of service in the inner district. The revision in rates suggested by Rudd would reduce the unit disparity to the point where the unit reve-

nues in the outer district would be 1.33 times those in the inner district and would make adequate allowance for the proprietary responsibilities of the inner-district residents. His report indicates the problem to be more practical than legal. See *Manchester Gardens Corporation* v. *Manchester,* 134 Conn. 499, 502, 58 A.2d 734.

There is no error.

In this opinion the other judges concurred.