Duane S. PLATT and Donna L. Sall, as individuals, as trustees of the Duane S. Platt Living Trust, and as trustees of the Donna L. Sall Living Trust, Plaintiffs and Appellants,

v.

TOWN OF TORREY, Utah, a municipal corporation, Defendant and Appellee.

No. 950415.

Supreme Court of Utah.

Nov. 25, 1997.

Marvin D. Bagley, Richfield, for Plaintiffs and Appellants.

Ken Chamberlain, Tex R. Olsen, Richfield, for Defendant and Appellee.

HOWE, Justice:

Plaintiffs appeal from the trial court's judgment that the rate schedule imposed by defendant Town of Torrey charging different rates to resident and nonresident water users is valid and enforceable and denying plaintiffs' request for an injunction and damages.

## FACTS

Plaintiffs are residents of Wayne County, Utah, who own property, either personally or in trust, and reside just outside the limits of the Town of Torrey. Torrey is a municipal corporation of Wayne County which operates a municipal water system that provides culinary water to residents and nonresidents of the town. Torrey imposes connection fees for new water hookups and then varying monthly user charges that depend on whether the hookup is commercial or residential and on the amount of water used. In June 1989, the town adopted a moratorium on nonresident commercial hookups. The town continued at all times to supply residential out-of-town hookups as well as commercial and residential hookups to residents of the town.

In October of that same year, plaintiff Donna Sall, who was not yet residing on real property she and Duane Platt had acquired just outside the town's limits, purchased a water connection from Torrey for $1000. She asserts that she informed the mayor at that time of her intentions to build an RV park on the property. She was given a "Water Connection Agreement" signed by Torrey's then-mayor and attested to by the town clerk.

In early 1990, plaintiffs began to develop the RV facility. They hired a contractor to install a water meter and requested permission from the town to install a commercial one-inch pipe instead of a residential three-quarter-inch pipe. The town denied their request because of the moratorium but placed them on the priority list for such a hookup. Consequently, plaintiffs were required to delay their plans to develop their property.

In the summer of 1994, plaintiffs moved onto their property and requested that the town activate their water connection to provide water for residential use. Plaintiffs also applied for a permit from the State of Utah to drill a well to provide water for their commercial venture. Torrey approved activation of plaintiffs' water connection, contingent on plaintiffs' extending the town's six-inch water main to their property. After plaintiffs made that extension at their own expense, the town installed and activated a residential three-quarter-inch connection.

In November 1994, the mayor informed plaintiffs that they could abandon their plans to drill a well because Torrey planned to obtain a loan from the State Board of Water Resources to improve the town's water system and to allow it to provide commercial service to nonresidents. Torrey's loan application was approved in the spring of 1995. Thereafter, Torrey executed a bond to the state in conjunction with this loan. Under the terms of the bond, the connection and user fees charged by Torrey are placed into an escrow account and are then used to make the annual payment on the bond.

In early 1995, plaintiffs completed construction of a residence and gift shop. They planned to open an RV park sufficient to accommodate 12 RVs in June of that year. Therefore, after learning of the approval of Torrey's loan application, plaintiffs again requested a commercial hookup. They were informed that they would have to file a formal application, but after they did so, the town council tabled the application.

In May, plaintiffs began operating their gift shop, which included an espresso bar, even though Torrey had not approved their commercial application. The gift shop used approximately five gallons of culinary water a day that was supplied through their residential connection.

In June, the town council approved a resolution providing for both residential and commercial out-of-town hookups. The resolution included a new rate schedule that imposed higher connection fees in most cases and higher user rates for nonresidents than residents.[1] Thereafter, Platt appeared before the town council and informed them of his plans to open the RV park without a commercial connection and inquired whether doing so would create any problem. The town council warned Platt that if the RV park were opened, plaintiffs' water would be shut off. The very next day, plaintiffs' water was turned off on the stated ground that the water supplied through their residential connection was being used for commercial purposes.

In response, plaintiffs filed a complaint, seeking a temporary restraining order and permanent injunction restoring plaintiffs' water service and enjoining Torrey from interfering with plaintiffs' water for residential and commercial purposes in the future. The complaint also sought a declaratory judgment requiring that Torrey charge residents and nonresidents the same rates. In this regard, plaintiffs contend that the residents' rate schedule for connection and user fees should be applied to them as well.

The court held a hearing on the motion for a temporary restraining order. Although the town council's June resolution established fees for commercial and residential out-of-town hookups, Torrey maintained at the hearing that its moratorium on commercial out-of-town hookups was still in effect, and therefore, that plaintiffs could not have their water service restored. Despite these contentions, at the close of the hearing the trial court issued an order restoring plaintiffs' residential water use.

Thereafter, a trial was held regarding the validity of the rate schedule. After a portion of the evidence was presented, the parties reached a stipulation which provided, in part, that Torrey would immediately call a special meeting of the town council to reconsider plaintiffs' application for a commercial connection. The town council, in an emergency meeting, lifted the moratorium on new commercial service outside of town and approved plaintiffs' application. After the remaining evidence was presented, the trial court ruled that the rate schedule contained in the June 8 resolution was valid and enforceable. The court therefore denied plaintiffs' claims that enacting the rates unlawfully discriminated and that the rate schedule breached a contract between Torrey and plaintiffs.

Plaintiffs appeal, contending that the trial court erred in ruling that (1) Torrey's rate schedule, which generally charges higher connection and user fees to nonresidents, does not discriminate illegally; (2) the town's use of resident and nonresident connection and user fees to pay its bonded indebtedness does not require it to charge both classes of consumers the same rate; and (3) Torrey did not breach the water connection agreement given to Sall when it charged plaintiffs high-

1. For example, under the new fee schedule, a commercial *resident* user is charged $25 per month for the first 30,000 gallons of water used and then $.50 for each 1000 gallons used for the next 20,000 gallons. For usage over 50,000 gallons, the fee is $1 per 1000 gallons used. A *nonresident* commercial user is charged $50 for the first 10,000 gallons used and then $.50 for each 1000 gallons used for the next 20,000 gallons. For usage over 30,000 gallons, the fee is $1 for each 1000 gallons. Thus, resident commercial users pay $25 per month for the first 30,000 gallons while nonresidents pay $60 per month for the same amount of water. Anomalously, however, the connection fee for a one-inch commercial connection is $3000 for both residents and nonresidents.

er user and connection fees than it would have charged Torrey residents.[2] We review each of the trial court's rulings for correctness. *See Bagford v. Ephraim City*, 904 P.2d 1095, 1097 (Utah 1995); *Saunders v. Sharp*, 806 P.2d 198, 199–200 (Utah 1991) (per curiam); *Provo City Corp. v. Willden*, 768 P.2d 455, 456 (Utah 1989).

## ANALYSIS

■ Plaintiffs first contend that Torrey's disparate rate schedule is unlawfully discriminatory. They acknowledge that Torrey is under no obligation to provide water to non-residents but assert that having elected to provide that service, Torrey cannot discriminate and is therefore required to treat all users within its service area the same.[3] Whether a municipality must charge the same rate for water to residents and to non-residents is an issue of first impression in this court. However, plaintiffs claim indirect support for this proposition from this court's rulings in *County Water System, Inc. v. Salt Lake City*, 3 Utah 2d 46, 278 P.2d 285 (1954), and *Home Owners' Loan Corp. v. Logan City*, 97 Utah 235, 92 P.2d 346 (1939). We find no such support in those cases, but as will later be seen, the cases are helpful to our analysis for a more limited proposition.

In *County Water System*, we addressed whether a water corporation owned and operated by Salt Lake City was subject to regulation by the Public Service Commission ("PSC") when it distributed water beyond its city limits.[4] We held that allowing "the PSC to exercise jurisdiction over municipal property and the management thereof would be an unconstitutional delegation of power to a special commission forbidden by article VI,

section 29 [of the Utah Constitution]." 278 P.2d at 290. The primary justification for this conclusion was that

the authority of the city to sell its surplus water beyond the city limits is derived in the same manner and from the identical section of the statute which permits it to supply its own inhabitants. Such sale of surplus water, being authorized by law as a municipal function, is as much a municipal function as the supplying of water within the city limits, and disposing of the surplus outside its limits as permitted by statute does not change its character as a municipality....

*Id.* On the basis of this language, plaintiffs contend that *County Water System* stands for the proposition that "[b]ecause supplying water to nonresidents within the Town's service area is as much a municipal function as supplying water to its own residents, the Town is likewise required to treat nonresident users within its service area on the same equal basis." We disagree. Nothing in *County Water System* suggests that nonresidents are entitled to the same water rates as residents. As we later discuss, it only supports the proposition that a reasonable basis must exist for the disparate treatment of residents and nonresidents.

We also reject plaintiffs' reliance on *Home Owners' Loan Corp. v. Logan City* for their contention that resident and nonresident rates must be the same. There we addressed whether a city could refuse to provide water services to a residence because a former tenant or owner had failed to pay his water bill. After holding that a city is prohibited from such an act, we turned to the

**2.** Plaintiffs cursorily raise a fourth argument that the trial court erred in ruling that plaintiffs were required to pay the newly enacted water fee even though they had applied for a commercial connection that was wrongfully denied before the increase in rates. However, the argument is not properly briefed and seems to address many of the same issues as plaintiffs' other arguments. *See Rukavina v. Triatlantic Ventures, Inc.*, 931 P.2d 122, 125 (Utah 1997). Therefore, we do not address the fourth issue in the text of the opinion.

**3.** Plaintiffs' contention that Torrey illegally discriminates is not an argument that some nonresi-

dents are treated differently than other nonresidents. That is apparently not the case, as it seems that all nonresidents are subject to the same connection fee and rate schedule. Rather, plaintiffs maintain that the prohibited discrimination is treating nonresidents as a class differently than residents.

**4.** We had previously held in *Logan City v. Public Utilities Commission*, 72 Utah 536, 271 P. 961 (Utah 1928), that a municipally owned water company serving its own residents was not subject to PSC regulation.

issue of whether mandamus was the proper remedy in such a case. We recognized the general rule that a public service corporation which occupies city streets is under a legal duty to supply all resident customers who comply with its reasonable regulations and then held that mandamus is indeed the proper remedy when such service is wrongfully withheld. We stated:

> Mandamus has long been held the proper remedy to compel a public service corporation to supply an applicant with electricity, gas, or water where the *reasonable* rules of the corporation have been complied with.... For purposes of this action, we see no distinction between a public service corporation and a municipality itself.

92 P.2d at 349 (citations omitted) (emphasis added). Once again, the quoted language is not pertinent to whether a municipally owned water system must charge the same rates to residents and nonresidents. Like *County Water System*, it simply supports the notion that a municipally owned utility must act reasonably when serving its residents and that the courts will enforce reasonableness when it does not. We therefore reject *County Water System* and *Logan City* as support for the proposition that a municipally owned water system must charge the same rate to residents and nonresidents.

The requirement that a municipality supplying public services to its own residents must act reasonably is stated more explicitly throughout Utah law. Article XI, section 6 of the Utah Constitution mandates that a municipal corporation supply water owned by it to its inhabitants "at reasonable charges." Utah Code Ann. § 10–8–38 authorizes municipalities to construct and operate sewer systems and to "make a reasonable charge for the use thereof."[5] This court has also held that water and sewer connection fees must be reasonable. *Banberry Development Corp. v. South Jordan City*, 631 P.2d 899, 901 (Utah 1981); *see also Call v. City of West Jordan*, 614 P.2d 1257, 1258 n. 1, 1259 (Utah 1980) (ruling that ordinance requiring developer of subdivision to "dedicate seven percent of the land area of the proposed subdivi-

sion to the public use" or pay equivalent in cash be reasonable); *Mantua Town v. Carr*, 584 P.2d 912, 914 (Utah 1978) ("[A court] will not intervene [in the administration of municipal services] unless the administrative action is capricious, arbitrary or unreasonable...."); *Rose v. Plymouth Town*, 110 Utah 358, 173 P.2d 285, 287 (1946) (mandamus will not lie to compel town officials to extend water line to plaintiff's residence unless refusal is unreasonable). Furthermore, courts of this state have not hesitated to enforce reasonableness in myriad other situations involving other services. *See, e.g., Crawford v. City of Manti*, 18 Utah 2d 79, 415 P.2d 665 (1966) (holding that ordinance regulating city-owned cemetery must be reasonable); *Salt Lake City v. Bennion Gas & Oil Co.*, 80 Utah 530, 15 P.2d 648 (1932) (holding amount of fee for municipal inspection of gasoline and oil may be set by city's legislative department within reasonable limits).

It is significant that Utah courts have enforced this reasonableness standard on behalf of residents despite the fact that municipal residents are politically empowered to vote against the political regime that enacted the unreasonable rates. Nearly seventy years ago in *Logan City*, 271 P. 961, the case in which we decided that a municipal utility furnishing service to its own residents is not subject to regulation by the Public Service Commission, we stated:

> Because patrons, customers or consumers of a product of a privately owned public utility, as a rule have no voice in the handling and management of the business, nor in fixing and establishing rates and charges, and no adequate remedy or redress against unreasonable or excessive or unjust rates or charges fixed by a public utility company, there are good legal reasons for the state ... to fix a reasonable and just rate or charge for such a utility, or to delegate the power to do so to a commission or board of its creation. But no such ground exists to so safeguard and protect taxpayers and citizens of a town or city owning and operating its own utility

---

**5.** This explicit reasonableness requirement may extend to nonresidents receiving sewer services as well. However, no court has addressed the issue, and we make no conclusion regarding it.

for its own use and for the use and benefit of its inhabitants.... If officers, boards, or agents chosen and selected by them do not comply with their demands or requests, *or fix an unfair or an unreasonably low or high or a discriminatory rate or charge,* others can be chosen or selected to establish a proper and fair rate or charge *or consumers may appeal to the courts to correct any such abuses.*

*Id.* at 971.

■ We turn now to the furnishing of services by a municipality to nonresidents. We begin by observing that Utah Code Ann. § 10-8-14 (1996) authorizes municipalities to construct and operate "waterworks, sewer collection, sewer treatment systems, gas works, electric light works, telephone lines or public transportation systems" and to "deliver the surplus product or service capacity of any such works, not required by the city or its inhabitants, to others beyond the limits of the city." The statute is silent on whether the charges to nonresidents must be reasonable, as charges to residents are required to be. Nevertheless, upon reflection we find no reason why the requirement of reasonableness that protects municipal residents should not also be extended to nonresidents who subscribe to municipal services.[6] In fact, several reasons dictate that municipalities should act reasonably with their nonresident customers when furnishing necessary services, which many times are not available to them elsewhere.

In *County Water System,* we held that a municipal utility providing water to nonresidents was not subject to rate regulation by the PSC because the utility was performing a municipal function, the same as when it served residents. That being so, the requirement of reasonableness, which attends all actions by municipalities, should not cease at the city limits. This is especially so because nonresident customers have less political recourse to combat unreasonable rates than do residents. If politically empowered residents have recourse to the courts when their municipal government acts unreason-

ably, even more so should nonresidents enjoy the protection of the judiciary against similar conduct. Indeed, judicial review for unreasonableness may be the nonresidents' sole remedy.

Requiring that nonresident rates be reasonable strikes the proper balance between competing issues in this area—affording nonresidents protection while allowing a municipality to recoup some return on its investment in the utility and maintain considerable autonomy. As one commentator stated:

> Municipal ownership of a utility generates a conflict between economic and political considerations. The problem is common, since many cities sell utility service to nonresidents and most of these do so at higher rates. All the economic factors, such as the public need for the service, limited supply of a natural resource and wasteful duplication of facilities, which impose on a privately owned utility the duty of providing nondiscriminatory and reasonable rates to all consumers, recommend that the fact of city ownership should not alter this basic utility obligation.... However, other factors, more political in nature, are worthy of consideration. A city's purchase of a utility plant is made on behalf of its citizens, who then become both consumers and owners. The requirement of serving non-residents at the same rates as residents partly defeats the purpose of ... ownership. Utility service is only one phase of a prevalent situation in which non-residents adjacent to cities enjoy the economic and other advantages of city life without being subject to all the responsibilities of citizens....
>
> To resolve both the economic and political considerations many states have made the extraterritorial sale of municipal utility service subject to rate regulation by the state public utilities commission. Thus the non-residents are afforded protection against exorbitant rates, and the cities are allowed a fair profit from sales beyond their corporate boundaries. Where ... there is no [regulation by a] utilities com-

---

**6.** This is not to say that the rates charged the two classes of customers must be the same for, as we will later discuss in this opinion, there are many

potentially legitimate reasons why higher charges to nonresidents may be justified.

mission, the courts can achieve the same desirable result by setting aside unreasonable rates to the non-residents.

*Recent Cases,* 101 U. Pa. L.Rev. 140, 161–62 (1952) (footnotes omitted.)

Requiring a reasonable basis for higher nonresident rates accords with the overwhelming majority of cases from other jurisdictions. *See Jung v. City of Phoenix,* 160 Ariz. 38, 770 P.2d 342 (1989); *Delony v. Rucker,* 227 Ark. 869, 302 S.W.2d 287 (1957) (interpreting statute requiring reasonable rates); *Hansen v. City of San Buenaventura,* 42 Cal.3d 1172, 233 Cal.Rptr. 22, 729 P.2d 186 (1986); *Barr v. First Taxing Dist.,* 151 Conn. 53, 192 A.2d 872 (1963); *Mohme v. City of Cocoa,* 328 So.2d 422 (Fla.1976); *Cooper v. Tampa Elec. Co.,* 154 Fla. 410, 17 So.2d 785 (1944); *Inland Real Estate Corp. v. Village of Palatine,* 146 Ill.App.3d 92, 99 Ill.Dec. 906, 496 N.E.2d 998 (1986); *Usher v. City of Pittsburg,* 196 Kan. 86, 410 P.2d 419 (1966); *Louisville & Jefferson County Metro. Sewer Dist. v. Joseph E. Seagram & Sons, Inc.,* 307 Ky. 413, 211 S.W.2d 122 (1948); *City of Hagerstown v. Public Serv. Comm'n,* 217 Md. 101, 141 A.2d 699 (1958) (based on statute requiring PSC to fix reasonable rate for service to nonresidents); *County of Oakland v. City of Detroit,* 81 Mich.App. 308, 265 N.W.2d 130 (1978); *Borough of Ambridge v. Pennsylvania Pub. Util. Comm'n,* 137 Pa.Super. 50, 8 A.2d 429 (1939) (interpreting statute requiring reasonable rates); *Town of Terrell Hills v. City of San Antonio,* 318 S.W.2d 85 (Tex.Civ.App.1958); *Handy v. City of Rutland,* 156 Vt. 397, 598 A.2d 114 (1990); *Faxe v. City of Grandview,* 48 Wash.2d 342, 294 P.2d 402 (1956) (holding that state constitution required reasonable nonresident rates); *cf. Mayor & Council of Dover v. Delmarva Enterprises, Inc.,* 301 A.2d 276 (Del.1973); *Schroeder v. City of Grayville,* 166 Ill.App.3d 814, 117 Ill.Dec. 681, 683, 520 N.E.2d 1032, 1034 (1988) ("[A]l-

though not obligated to serve non-residents in the absence of a contractual relationship, a municipality is prohibited from discriminating unreasonably in rates or manner of service when it elects to serve non-residents."); *Mayor & City Council of Cumberland v. Powles,* 255 Md. 574, 258 A.2d 410 (1969). Commentators in this area are also in agreement with extending the reasonableness requirement to nonresidents. *See* Charles S. Rhyne, *The Law of Local Government Operations* § 23.16 (1980); 2 Chester James Antieau, *Antieau's Local Government Law* § 19.08 (1996) ("Local government utilities can discriminate against nonresidents in rates whenever such differentiated treatment is reasonable."); 12 Eugene McQuillan, *The Law of Municipal Corporations* § 35.35.45 (3d ed. 1995) ("The duty of a municipality owning a public utility to furnish services and supplies without discrimination and at reasonable rates extends to users outside the city, ... where the city has undertaken to serve the public outside the city."). However, a few courts have ruled otherwise, usually on a constitutional or statutory basis peculiar to that jurisdiction.[7]

■■■ In the instant case, because we are specifically concerned with water rates, additional concerns enter into our analysis. The most fundamental principle of water law in this arid state is found in Utah Code Ann. § 73–1–1 (1989):

> All waters in this state, whether above or under the ground are hereby declared to be the property of the public, subject to all existing rights to the use thereof.

The extent of anyone's right to use water (including municipalities) is limited to that amount which can be put to beneficial use. *See* Utah Code Ann. § 73–1–3 ("Beneficial use shall be the basis, the measure, and the limit of all rights to use the water in this state."). Thus, the nonuse of water for five

---

7. *See City of Fort Collins v. Park View Pipe Line,* 139 Colo. 119, 336 P.2d 716 (1959) (en banc) (holding that nonresident rates are matter of contract that will not be reviewed for reasonableness; *Barr v. City Council of Augusta,* 206 Ga. 753, 58 S.E.2d 823 (1950); *Forest City v. City of Oregon,* 569 S.W.2d 330 (Mo.Ct.App.1978) (statute allowing municipalities to sell water "upon such terms and under such rules and regulations

as it may deem proper" made issue one of contract); *Fairway Manor, Inc. v. Board of Comm'rs,* 36 Ohio St.3d 85, 521 N.E.2d 818 (1988) (holding that constitutionally conferred right to operate utility without restraint or restriction by general assembly limits courts' role to reviewing resident rates for reasonableness); *Calcaterra v. City of Columbia,* 315 S.C. 196, 432 S.E.2d 498 (S.C.Ct.App.1993).

years by an appropriator works a loss of the right to the unused water, and it reverts to the public for appropriation and use by someone else. *Id.* § 73–1–4(1)(a), (4)(a)–(b).[8] Even the water rights owned by municipalities are subject to forfeiture for nonuse. *Nephi City v. Hansen,* 779 P.2d 673 (Utah 1989). Thus, it appears that the legislature, in authorizing municipalities to sell their surplus water to nonresidents, accorded them a measure of protection against the loss of the right to such surplus water. In availing themselves of that protection, municipalities ought to deal reasonably with those who purchase the surplus water and who might otherwise be able to appropriate it for their own use.

Arguably, some nonresidents may be able to annex and take advantage of the constitutional protection of "reasonable rates" accorded to residents. However, for a nonresident to be annexed, certain rigorous requirements must be met: The property must be contiguous to the municipal limits; the municipality must consent; and a majority of the real property owners and· the owners of at least one-third in value of the real property must petition for annexation. Utah Code Ann. § 10–2–416. Therefore, the opportunity for annexation offers insufficient protection for nonresidents against unreasonable water rates.

On the basis of these considerations, we conclude that in the sale of this scarce resource in which the public has an interest, municipalities must deal reasonably with nonresidents, as they do with their own residents. Thus, a showing by nonresident plaintiffs, when contesting a rate schedule, that rate discrimination rests solely on the nonresident status of the user, without some other legitimate justification, will invalidate the schedule.

8. The appropriator or his successor in interest may, however, file for an extension of time with the state engineer. *Id.* § 73–1–4(1)(a)–(b).

9. In *Brummitt v. Ogden Waterworks Co.,* 33 Utah 289, 93 P. 828 (1908), this court employed a similar procedure to that outlined above to uphold a city ordinance enacting water rates for residents that the plaintiffs claimed were unreasonable. We stated:

■ Before proceeding to analyze Torrey's rate schedule, we note:

> Rates established by a municipality for utility service to inhabitants are presumptively reasonable. It follows that one who challenges such rates as unreasonable has the burden of proof. We see no reason why the same principle should not apply with regard to a challenge to the reasonableness of nonresident utility rates.

*Faxe,* 294 P.2d at 408 (citations omitted). "A presumption of validity is accorded rates enacted by municipal ordinance and plaintiffs bear a heavy burden of proving that the rates charged are unjustly discriminatory and unreasonable." *Inland Real Estate,* 99 Ill.Dec. at 910, 496 N.E.2d at 1002; *see also Laramie Citizens for Good Gov't v. City of Laramie,* 617 P.2d 474, 484 (Wyo.1980) ("The burden of proof is on the party contesting the reasonableness and nondiscriminatory nature of the charges."); 12 Eugene McQuillan, *The Law of Municipal Corporations* § 35.37.05 (3d ed. 1995) ("The burden of proof is on the party claiming unreasonableness or discrimination."). Thus, a "city has no duty to explain or justify its actions in setting rates until such burden has shifted to it by the establishment of a prima facie case of invalidity based on competent evidence." *City of Pompano Beach v. Oltman,* 389 So.2d 283, 286 (Fla.Dist.Ct.App.1980). Trial courts should not require a municipality to make *any showing* until plaintiffs contesting a rate have demonstrated that no reasonable justification exists for the higher rate. After that showing has been made, a municipality may proffer proof of its own to rebut the plaintiff's case or establish a reasonable justification unaddressed by the plaintiff.[9]

■ Higher rates may be justified by a variety of circumstances, some of which may exist in this case. Although testimony and

> With respect to the contention that one of the plaintiffs was charged unreasonable and excessive rates, the evidence did not sustain the contention, and the court found against it. Until the contrary is shown, the presumption will prevail that water rates agreed upon between the city and the company are fair and reasonable.

*Id.,* 93 P. at 831–32.

evidence were adduced that alluded to the possible existence of some of these circumstances, the trial court made no findings of fact concerning them. We will therefore address the justifications that might exist in this case on which other appellate courts have relied and remand this case to the trial court for a determination of whether sufficient justification for the higher nonresident rate exists here.

At the threshold, plaintiffs must prove that the cost of servicing nonresidents who are charged the higher rate does not justify the price differential. It has been widely held in other jurisdictions, and appears to be well settled, that greater costs associated with servicing nonresidents in and of themselves justify a higher rate to nonresidents that reflects those cost differences. See, e.g., Hansen, 233 Cal.Rptr. at 27–30, 729 P.2d at 192–94; McQuillan, § 35.37.10 ("A municipality has the right to classify consumers under reasonable classifications based upon such factors as the cost of service. . . ."). We agree. In this regard, we note that plaintiffs bore the expense of extending a six-inch line to their property. However, if on remand the trial court finds that there are other increased costs in servicing nonresidents which justify the higher rate that Torrey charged nonresidents, it should uphold the rate schedule without additional inquiry into other possible justifications. Simply put, "[i]f the difference in rates is reasonably related to a difference in the costs of providing the service, there is no unreasonable discrimination." Austin View Civic Ass'n v. City of Palos Heights, 85 Ill.App.3d 89, 40 Ill.Dec. 164, 173, 405 N.E.2d 1256, 1265 (1980).

However, even if no cost justification exists, other justifications could exist. "Proof that service of nonresidents involves greater expenses is sufficient to show a city acted reasonably in charging high rates for nonresidents," but "other factors may also bear upon the question of reasonableness." Jung, 770 P.2d at 345. One might be that residents of Torrey bear risks that nonresidents do not

bear. For example, it is unclear from the record who would be responsible for financing a major repair in the event of a catastrophe or breakdown. It is pertinent whether residents alone bear this risk. As the California Supreme Court recognized, the fact that "nonresidents do not have the same obligations and responsibilities for the replacement and repair of the system in the event of disaster or to provide for the expansion to meet population growth," Hansen, 233 Cal.Rptr. at 29, 729 P.2d at 193, is a valid justification for a higher nonresident rate. In addition, Torrey argued, although once again no findings were made regarding the issue, that the citizens of Torrey would be responsible for paying the bond if the revenues from the connection and water fees became insufficient.[10] It also seems that only Torrey bears the risk of tort liability. See Oakland, 265 N.W.2d at 132. If residents of Torrey alone bear these risks and the risks are tangible and proportional to the difference in rates, the schedule should be validated.

Another justification might be that residents of Torrey as a class have made or are making contributions to the system that nonresidents have not made or are not making. Torrey asserts in its statement of facts that the water system was constructed with contributions of money and volunteer labor from early residents of Torrey, but the trial court made no finding in this regard. If residents have contributed money, be it tax dollars or other funds, or labor to create the water system from which nonresidents now seek to benefit, the residents are entitled to a lower water price that reasonably reflects those contributions. It may also be that monies from the general fund have been or are currently being used to pay personnel who manage and operate the system. The record indicates that engineers oversee the system along with the mayor and a town clerk, and other people may be involved. However, there are no indications whether these persons are paid for performing these functions and, if so, whether their salaries are paid from the general fund or water revenues. If

---

10. Currently, the bonded indebtedness is paid with revenue raised through connection and user fees. However, it is not clear from the record what might take place if those revenues became insufficient or the likelihood of the occurrence of that situation.

employees who operate the water system are paid with general funds, this may justify a lower rate for residents. *See Hansen,* 233 Cal.Rptr. at 29, 729 P.2d at 193 (finding as valid justification that "the nonresidents have not made and do not make the same financial contributions to the maintenance of the water system as do residents"). As the Washington Supreme Court stated, "[A] city boundary line ... usually serves to divide those customers who have made a capital contribution to the system, who have assumed responsibility for its operation, and who have, through general municipal functioning, contributed to its support and development, from those who have not." *Faxe,* 294 P.2d at 409. "Even in a case ... where the utility is supported by revenues instead of taxes, it is the city that bears all of the burdens and responsibilities of management," *Town of Terrell Hills,* 318 S.W.2d at 88, and the city residents should receive some benefit for this added responsibility. Thus, if the trial court should find on remand that residents have subsidized or are currently subsidizing, directly or indirectly, the construction, maintenance, or supervision of the water system in a way that nonresidents are not, in an amount sufficient to justify the higher rates, the rate schedule should be upheld.

■ Finally regarding this issue, we note: "Reasonable discretion must abide in the officers whose duty it is to fix rates. Rate making ... is an inexact science and their determination should not be disturbed if there is any reasonable basis for that determination...." *McQuillan,* § 35.37.05 (footnotes omitted). Rate making is a legislative function to which courts owe a degree of deference. "In adjudicating the validity of any individual application of the standard of reasonableness, the courts must concede municipalities the flexibility necessary to deal realistically with questions not susceptible of precise measurement. Precise mathematical equality 'is neither feasible nor constitutionally vital.'" *Banberry,* 631 P.2d at 904 (quot-

ing *Airwick Indus., Inc. v. Carlstadt Sewerage Authority,* 57 N.J. 107, 270 A.2d 18, 26 (1970)). A court should "exercise caution in declaring such an act invalid because it rests upon discretion vested in public officers, chosen directly or indirectly by the people." *Louisville & Jefferson County,* 211 S.W.2d at 125. Courts are not the equivalent of a utilities commission, but rather serve as a protection against arbitrary, capricious, or unreasonable behavior. Therefore, the trial court should not require that the higher rate for nonresidents be justified dollar for dollar. Instead, courts should seek to determine whether the rate is unreasonable in light of the factors addressed in this opinion.[11]

■ Plaintiffs' second contention is that Torrey is required to charge the same rate to residents and nonresidents because the revenue from the water system is being used to retire Torrey's bonded indebtedness. Plaintiffs cite *Patterson v. Alpine City,* 663 P.2d 95 (Utah 1983), as support for that proposition. In *Patterson,* Alpine City joined several other cities to establish a waste water treatment facility that would serve all of the cities involved. Alpine deposited $375,000 to obtain funding from the federal government. It then proposed to charge $700 for the immediate purchase of a permit to hookup to the system but $1500 for a permit purchased just two months later. Alpine City contended that the higher rate was necessary to enable it to repay its bonded indebtedness. In overturning the discriminatory rate schedule, we stated, "If the connection fee is indeed to be used to retire bonded indebtedness, then all users on the system must be treated equally and late-comers cannot be subjected to an arbitrary increase of over 100% in a period of two months." *Id.* at 97.

*Alpine City* offers no support for plaintiffs' position for two reasons: First, the plaintiff in *Alpine City* was a resident of the city who was being charged the higher rate. We found that Alpine City had proffered no legitimate reason why residents who connected to

---

11. We do not mean to suggest that the list of factors addressed in this opinion is exhaustive. It very likely is not. If the trial court finds that other factors not addressed herein are relevant, it should consider them as well as long as they provide a legitimate justification for the disparate

rates charged residents and nonresidents. For example, courts have considered whether the expansion was done for the nonresidents, *Barr,* 192 A.2d at 874, and that the city provides police and fire protection to the plant, *Oakland,* 265 N.W.2d at 132.

the sewer system a few weeks later than the original subscribers but were otherwise similarly situated with those residents should be charged a rate more than double that of the original subscribers. The facts of *Alpine City* are clearly distinguishable from those currently before us where *nonresidents* are contesting the higher rate. Second, *Alpine City* involved the creation of a system rather than its expansion, as presented in this case. Alpine's sewer system was created for the use of all residents of that city, which provided the basis for ruling that all residents should be treated the same. In the instant case, however, there was testimony that the bonded indebtedness was incurred to fund the expansion of Torrey's water system. Torrey undertook this expansion primarily to service nonresident users, as Torrey apparently had enough water to supply its own residents. Thus, we reject plaintiffs' contention that the fact that Torrey uses water revenues to pay its bonded indebtedness entitles all users of the system to equal rates.

▆▆▆ Finally, plaintiffs contend that Torrey breached a contract with Sall when it enacted the resolution charging Sall the higher nonresident rate. Plaintiffs rely on the Water Connection Agreement given to Sall, signed by Torrey's then-mayor, and attested to by the town clerk. The agreement provides, "In the event cost experience requires the Town Board to raise the water rate to inhabitants in the Town of Torrey, this contract shall be amended to include a water rate consistent with that rate charged the inhabitants of Torrey Town." The trial court found that Sall received the agreement when she paid her connection fee in 1989; however, no conclusion was made by the court as to whether giving the agreement to Sall created a contract and, if so, whether that agreement continued to govern the relationship of the parties. Instead, the court simply concluded that plaintiffs' claim for breach of contract should be denied. Therefore, on remand the trial court should determine (1) whether the parties entered into a contract which obligated Torrey to charge plaintiffs a rate equal to that of Torrey residents, (2) if so, whether that contract is enforceable,[12] and (3) whether Torrey breached that contract by the new rate schedule.[13]

## CONCLUSION

Thus, on remand the trial court should address whether the disparate rate charged nonresidents is justified and, if so, whether Torrey nonetheless breached a contract with plaintiffs when it enacted the new rate schedule.

Remanded for proceedings consistent with this opinion.

DURHAM and RUSSON, JJ., concur in Justice HOWE's opinion.

ROBERT T. BRAITHWAITE, District Judge, dissenting:

I respectfully dissent. I will not attempt to respond to all of the extended analysis of the majority. Stripped to its essentials, the issue in this case is whether district courts should be installed as profit referees in water sale contracts between municipalities and nonresidents. My view is that the majority

12. In addressing this matter, the trial court should determine whether such a contract violates the general rule that "the fixing of municipal utility rates is a 'legislative' or 'governmental' power that cannot be bargained away, restricted by contract, or dealt with in any way so as to curtail the power of future governing bodies to determine and fix reasonable utility rates." 2 Chester James Antieau, *Antieau's Local Government Law* § 19.06 (1996); *see Fjeldsted v. Ogden City*, 83 Utah 278, 303, 28 P.2d 144, 154 (Utah 1933) ("The board of commissioners may not by contract restrict or curtail the powers of future boards to determine and to fix reasonable rates."); *Brummitt*, 93 P. at 833 ("That the fixing and regulating of water rates is a governmental function and cannot be surrendered nor suspended by the city council is agreed to by all concerned...."). It is unclear whether the alleged contract in this case would restrict the rate-making powers of future representatives to the degree the contracts prohibited in *Brummitt* and *Fjeldsted* did, and no evidence was taken on the issue. Therefore, we think it appropriate that the trial court address the issue on remand after the factual issues surrounding the contract are clarified.

13. If the trial court concludes that Torrey indeed breached its contract with plaintiffs, the rate schedule is not necessarily invalid. It appears that plaintiffs would be entitled to damages or equitable relief, but the new rate schedule could continue in effect.

opinion reverses present Utah case law and mandates unneeded and unworkable guidelines that are not required by the Utah Constitution, Utah statutes, or sound public policy.

**1. There is no constitutional or statutory requirement that municipalities provide water to nonresidents.**

Article XI, section 6 of the Utah Constitution requires municipal corporations to preserve, maintain, and operate their water systems to supply their *residents* with water at reasonable charges. There is no similar constitutional or statutory mandate regarding nonresident users.

**2. Nonresidents have no inherent right to receive municipal services.**

A person who is not a resident of a nearby municipality is not subject to the jurisdiction of that municipality. The town's taxes, ordinances, and regulations have no effect outside of town limits.[1] By the same token, the nonresident has no standing to demand municipal services. Nonresidents pay no town taxes and do not participate in electing representatives or governing the town. They do not have to pay the bills if the town incurs liabilities, cash shortfalls, or other budgetary problems from operating the town, including water departments.

With respect to providing service outside its territorial limits, municipal corporations may maintain waterworks, "and they may sell and deliver the surplus product or service capacity of any such works, not required by the city or its inhabitants, to others beyond the limits of the city." Utah Code Ann. § 10–8–14(1). The decision whether to sell water outside city limits rests solely with the town. No Utah statute or case law states otherwise.

**3. Should municipalities and nonresidents choose to contract for the sale and purchase of surplus water, they should continue to be allowed to do so freely, without oversight by a "profit referee."**

Until this case, municipalities and nonresidents have been allowed to contract freely for the sale and purchase of surplus water, without the validity of the contracts being contingent upon approval by a "profit referee."

Specifically, in *County Water System v. Salt Lake City*, 3 Utah 2d 46, 278 P.2d 285 (1954), this court determined that the Public Service Commission has no jurisdiction over the sale of a municipality's surplus water outside the municipality's boundaries. The court made the determination on the basis that allowing such review would be an unconstitutional delegation of power to a special commission. The court also noted:

> [T]here are numerous considerations which make it seem quite impractical for the city to be subjected to such regulation and control [by the PSC], including the fact that *it would be an almost impossible task*, both for the city and the Commission to analyze the city's finances with respect to construction, maintenance and operation costs of its water department, and apportion them between services rendered within and without the city limits.

*Id.*, 278 P.2d at 289 (emphasis added). The majority opinion now requires that district courts undertake such an admittedly "impossible task."

This case effectively overturns *County Water System*, substituting a district court for the Public Service Commission to determine what is and is not a reasonable profit. District courts are ill prepared to make such marketplace decisions, nor should they be called upon to do so.

This court has rejected similar attempts in other areas of the law, absent unconscionability in the contract. In a recent landlord/tenant case, *Woodhaven Apartments v. Washington*, 942 P.2d 918 (Utah 1997), this court upheld the ruling of the court of appeals with respect to unconscionability, which quoted two earlier Supreme Court opinions, *Resource Management Co. v. Weston Ranch & Livestock*, 706 P.2d 1028, 1041 (Utah 1985) (an oil and gas royalty contract case), and *Bekins Bar V Ranch v. Huth*, 664 P.2d 455, 459 (Utah 1983) (a debtor/creditor case) ("Al-

---

1. Utah Code Ann. §§ 10–1–101 to –203.

though courts will not be parties to enforcing flagrantly unjust agreements, it is not for the courts to assume the paternalistic role of declaring that one who has freely bound himself need not perform because the bargain is not favorable."). This court quoted with approval the court of appeals' language stating that " 'it is still the law in Utah that parties may contract at arms length without the intervention of the courts to rescue one side or the other from the result of that bargain.' " 942 P.2d at 924 (quoting *Woodhaven Apartments v. Washington*, 907 P.2d 271, 274 (Utah Ct.App.1995)).

This case represents a financial decision to be made by a nonresident. It is a situation played out frequently across the state. The decision the nonresident faces is this: Is it better for me financially to stay outside town limits, paying lower taxes but higher service rates (either town nonresident rates or the extra expense of installing a well), or is it better for me to join the town, paying lower service rates but higher taxes?

Residents located just beyond town limits may make frequent use of a town's streets, police and fire protection, parks, playgrounds, recreational programs, libraries, and other services, incurring no expenses through the town's real property taxes to pay for the facilities, the maintenance and operating costs, and the salaries of employees required to provide and operate such governmental amenities. Towns such as Torrey may in reality be using nonresident water rates to make up some of this difference. Doing so, if they are, would be neither illegal nor unconscionable.

There has been no showing that the Town of Torrey in this case, or towns generally, pursue disadvantaged nonresidents to coerce them into agreements charging unreasonable rates. This case represents the more typical situation: A nonresident purchases land outside a town yet approaches the town, requesting town services. The parties dicker and may or may not reach an agreement. If no agreement is reached, the nonresident may pursue annexation to the town and obtain all the rights (voting, resident rates, etc.) and all the responsibilities (town taxes, zoning, etc.) of residency. Both statutes [2] and case law [3] favor annexation to municipalities where municipal services are needed outside the municipal limits.

This court should continue to allow parties to negotiate freely and should not begin to regulate the agreements they reach in an effort to "even" rates out for nontaxpaying nonresidents.

As a practical matter, it may be that as a result of this case, both the majority's belief that the strict contract guidelines adopted will be beneficial and my belief that they will not may very well be moot. The reaction of municipalities may very well be simply not to enter into such contingent, voidable contracts. This will benefit neither the nonresidents nor municipalities with surplus water.

I would affirm the district court.

ZIMMERMAN, C.J., concurs in Judge ROBERT T. BRAITHWAITE's dissenting opinion.

Having disqualified himself, STEWART, Associate C.J., does not participate herein; District Judge ROBERT T. BRAITHWAITE sat.

---

**2.** Utah Code Ann. § 10–2–401(3).

**3.** *Sandy City v. Salt Lake County*, 827 P.2d 212, 222 (Utah 1992).